1  ROBBINS GELLER RUDMAN
2    & DOWD LLP
   DAVID C. WALTON (167268)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
4  Telephone:  619/231-1058
5  619/231-7423 (fax)
   dwalton@rgrdlaw.com
6      – and –
7  SAMUEL H. RUDMAN
   MARY K. BLASY (211262)
8  58 South Service Road, Suite 200
9  Melville, NY  11747
   Telephone:  631/367-7100
10 631/367-1173 (fax)
11 srudman@rgrdlaw.com
   mblasy@rgrdlaw.com
12
13 Attorneys for Plaintiff

14 [Additional counsel appear on signature page.]

15             UNITED STATES DISTRICT COURT

16          SOUTHERN DISTRICT OF CALIFORNIA

17 LISA COLLEY, Individually and on        )  Case No.  '15CV0540 L     KSC
   Behalf of All Others Similarly Situated, )
18                                          )  CLASS ACTION
                   Plaintiff,               )
19                                          )  COMPLAINT FOR VIOLATION OF
        vs.                                 )  THE FEDERAL SECURITIES LAWS
20                                          )
   OREXIGEN THERAPEUTICS, INC.,             )
21 JOSEPH P. HAGAN and MICHAEL A.           )
   NARACHI,                                 )
22                                          )
                   Defendants.              )
23 _____ )  DEMAND FOR JURY TRIAL

24

25

26

27

28

1    Plaintiff Lisa Colley, individually and on behalf of all others similarly situated,
2  by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants,
3  alleges the following based upon personal knowledge as to plaintiff and plaintiff's
4  own acts, and upon information and belief as to all other matters based on the
5  investigation conducted by and through plaintiff's attorneys, which included, among
6  other things, a review of Securities and Exchange Commission ("SEC") filings by
7  Orexigen Therapeutics, Inc. ("Orexigen" or the "Company"), as well as media reports
8  about the Company.  Plaintiff believes that substantial additional evidentiary support
9  will exist for the allegations set forth herein after a reasonable opportunity for
10  discovery.

11                          **INTRODUCTION AND OVERVIEW**

12    1.    This is a class action for violations of the anti-fraud provisions of the
13  federal securities laws on behalf of all persons who purchased Orexigen common
14  stock between March 3, 2015 and March 5, 2015, inclusive (the "Class Period"), and
15  who were damaged thereby.

16    2.    Orexigen is a biopharmaceutical company focused on the development of
17  pharmaceutical product candidates for the treatment of obesity.  Its top drug
18  development candidate is Contrave, which it claims "regulates appetite and energy
19  expenditure through [central nervous system] activity." Following the completion of a
20  series of clinical trials, Contrave was approved for commercial use by the U.S. Food
21  and Drug Administration ("FDA") in September 2014.

22    3.    However, as part of the FDA approval process for Contrave, Orexigen
23  and Takeda Pharmaceutical Company Limited ("Takeda"), which is developing the
24  drug with Orexigen, were required to conduct "a new randomized, double-blind,
25  placebo-controlled study to evaluate the effects of long-term treatment with Contrave
26  on the incidence of [major adverse cardiac events, or 'MACE'] in overweight and
27  obese subjects with [cardiovascular] disease or multiple [cardiovascular] risk factors,"
28  referred to as the "LIGHT study."

4.     On March 3, 2015, in connection with reporting to investors on the status of certain patent applications for Contrave, Orexigen disclosed the interim results of its ongoing LIGHT study, despite being admonished by the FDA for inappropriately releasing study data in the past.  The 9,000-patient study was designed to assess the extent to which the diet drug may increase the risk of MACE.  As presented by defendants on March 3, 2015, the interim results indicated that the drug not only did not increase cardiovascular risks, it actually *reduced* cardiovascular risks compared with a placebo.

5.     As a result of the Company's March 3, 2015 suggestions that its study showed Contrave provided heart health benefits, the price of Orexigen common stock skyrocketed from its March 2, 2015 close of $5.79 per share to trade as high as $9.37 per share in intraday trading on March 3, 2015, closing that day at $7.64 per share on highly unusual trading volume of more than 95.7 million shares.

6.     Later in the day on March 3, 2015, the FDA issued a fresh admonishment regarding the Company's disclosures, stating in pertinent part that the agency was not aware that the patent applications contained specific interim study data and expressing "serious concerns" about Orexigen's disclosure of the interim data.  The interim analysis was performed after the 9,000-patient trial had achieved only 25% of its primary endpoint events (MACE). This analysis contained only 94 events: 59 in the placebo group and 35 in the Contrave group. Endpoints with less than 100 total events are statistically unreliable and must be viewed with extreme caution.  The FDA also stated that it had already "strongly urged Orexigen to protect the interim data from public disclosure and [that the agency was] very disappointed by Orexigen's actions."

7.     Orexigen released a responsive statement on March 3, 2015, stating in pertinent part that it had filed the patent applications "based on the [interim] results in order to preserve the potential for additional intellectual property," and that *the Company "believed it was appropriate and necessary to make sure this information was equally available to all investors*." While the Company claimed to be willing to

1   work with the FDA to meet its "regulatory obligations," Orexigen stated that it was
2   "committed to simultaneously meeting its obligations to other regulatory authorities in
3   the U.S., such as the SEC, and abroad, such as the [European Medicines Agency
4   ('EMA')], which [it said were] relevant to, and ha[d] authority over, its business,"
5   *emphasizing that the "company [was] similarly committed to meeting its fiduciary*
6   *duties to shareholders*."

7       8.      Due to the Company's response to the FDA's admonition on March 3,
8   2015, emphasizing that the interim data disclosure, while not expressly condoned by
9   the FDA, was important and material information the investment community should
10  take heed of, the price of Orexigen stock closed up further on March 4, 2015 at $8.49
11  per share, again on unusually high trading volume of more than 40.5 million shares, as
12  the market continued to digest the positive news about the interim results.

13      9.      In the early afternoon of March 5, 2015, *Forbes* published a report
14  quoting various stock analysts and drug development experts speculating that the
15  Company's now repeated early disclosure of interim trial data could potentially
16  threaten its relationship with the FDA and its ability to obtain further drug approvals
17  with the agency.  On this speculation, then uncorroborated by anybody at the FDA,
18  the price of Orexigen stock began declining in the afternoon of March 5, 2015, closing
19  just above $8 per share, down from its opening price of $8.50 per share.

20      10.     Then, after the close of trading on March 5, 2015, *Forbes* published a
21  second report entitled "***Top FDA Official Says Orexigen Study Result 'Unreliable,'***
22  ***'Misleading*.'"  This report contained extensive commentary from an FDA official
23  charged with overseeing the Contrave postmarketing clinical trial program who stated
24  in pertinent part that the interim data from the study was probably "'***unreliable*,'"
25  "'***misleading*,'" and "'***likely false*,'" with the *Forbes* report warning that "*[i]f*
26  *Orexigen cannot find a way to set things right, it could face fines, civil penalties, or*
27  *even the withdrawal of Contrave from the market*."

28

1          11.    As a result of the FDA's March 5, 2015 statements challenging the

2    legitimacy and continuation of the Company's entire Contrave drug development

3    program, the price of Orexigen stock plummeted, dropping below $7 per share in

4    intraday trading and closing just above $7 per share on March 6, 2015, again on

5    unusually high trading volume.  This decrease in Orexigen's stock price was a result

6    of the artificial inflation caused by defendants' misleading statements on March 3,

7    2015 coming out of the stock price.

8                            **JURISDICTION AND VENUE**

9          12.    The claims herein are asserted under §§10(b) and 20(a) of the Securities

10   Exchange Act of 1934 ("1934 Act") and Rule 10b-5.  Jurisdiction is conferred by §27

11   of the 1934 Act.

12         13.    Venue is proper pursuant to §27 of the 1934 Act.  Orexigen's principal

13   place of business is in La Jolla, California and the false and misleading statements

14   were issued in large part from this District.

15                                **THE PARTIES**

16         14.    Plaintiff Lisa Colley purchased Orexigen common stock during the Class

17   Period as set forth in the attached certification and was damaged thereby.

18         15.    Defendant Orexigen is headquartered in La Jolla, California.  Orexigen's

19   common stock is traded under the ticker "OREX" on the NASDAQ, an efficient

20   market.

21         16.    Defendant Joseph P. Hagan ("Hagan") is and at all relevant times was

22   Chief Business Officer of Orexigen.

23         17.    Defendant Michael A. Narachi ("Narachi") is and at all relevant times

24   was Chief Executive Officer ("CEO"), President and a director of Orexigen.

25         18.    The defendants referenced above in ¶¶16-17 are collectively referred to

26   herein as the "Individual Defendants."  The Individual Defendants made, or caused to

27   be made, false statements that caused the price of Orexigen's common stock to be

28   artificially inflated during the Class Period.

1  19.   The Individual Defendants, because of their positions with the Company,
2  possessed the power and authority to control the contents of Orexigen's quarterly
3  reports, shareholder letters, press releases and presentations to securities analysts,
4  money and portfolio managers and institutional investors, *i.e.*, the market. They were
5  provided with copies of the Company's reports and press releases alleged herein to be
6  misleading prior to or shortly after their issuance and had the ability and opportunity
7  to prevent their issuance or cause them to be corrected.  Because of their positions
8  with the Company, and their access to material non-public information available to
9  them but not to the public, the Individual Defendants knew that the adverse facts
10 specified herein had not been disclosed to and were being concealed from the public
11 and that the positive representations being made were then materially false and
12 misleading.   The Individual Defendants are liable for the false and misleading
13 statements pleaded herein.

14                    **SCIENTER ALLEGATIONS**

15  20.   During the Class Period, the defendants had the motive and opportunity
16 to commit the alleged fraud. Defendants also had actual knowledge of the misleading
17 statements they made and/or acted in reckless disregard of the true information known
18 to them at the time.  In doing so, the defendants participated in a scheme to defraud
19 and committed acts, practices and participated in a course of business that operated as
20 a fraud or deceit on purchasers of Orexigen common stock during the Class Period.

21              **BACKGROUND TO THE CLASS PERIOD**

22  21.   Orexigen is a biopharmaceutical company focused on the development of
23 pharmaceutical product candidates for the treatment of obesity.   Its top drug
24 development candidate is Contrave, which the Company claims "regulates appetite
25 and energy expenditure through [central nervous system] activity."  Following the
26 completion of a series of clinical trials, Contrave was approved for commercial use by
27 the FDA in September 2014.

28

22.   However, as part of the FDA approval process for Contrave, Orexigen and Takeda were required to conduct "a new randomized, double-blind, placebo-controlled study to evaluate the effects of long-term treatment with Contrave on the incidence of [MACE] in overweight and obese subjects with [cardiovascular] disease or multiple [cardiovascular] risk factors," referred to as the "LIGHT study."

## MATERIALLY FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

23.   On March 3, 2015, during the trading day, Orexigen filed a Current Report on Form 8-K with the SEC signed by defendant Hagan disclosing that "[o]n March 3, 2015, the United States Patent and Trademark Office (the 'USPTO') issued U.S. Patent No. 8,969,371 (the '371 Patent') and made publicly available provisional patent applications (U.S. Application No. 61/913216, U.S. Application 61/914938 and U.S. Application No. 61/984580) (the 'Provisional Patent Applications') to which the 371 Patent claims priority." However, in addition to reporting on the issuance of the patent and patent applications, the Company also provided information about the status of the ongoing Contrave clinical trial, stating in pertinent part as follows:

The 371 Patent and the Provisional Patent Applications *incorporate data from a pre-planned interim analysis of the large, randomized, placebo-controlled, cardiovascular ("CV") outcomes trial of Contrave®* . . . , or the Light Study. The 371 Patent, which expires in 2034, is the first in the Light Study family of patent applications Orexigen has prosecuted and covers two subgroups of the larger Light Study patient population. The Provisional Patent Applications are part of the same family of patent applications that were first filed in December 2013.

*The 371 Patent and the Provisional Patent Applications contain claims related to a positive effect of Contrave on CV outcomes. The observed effects on CV outcomes were unexpected and appear to be unrelated to weight change*.

\*   \*   \*

The Light Study randomized 8,910 obese patients with a primary endpoint of evaluating the impact of treatment on the combined incidence of myocardial infarction (heart attack), stroke and CV death in patients taking Contrave versus placebo. For regulatory approval purposes, the Light Study included a pre-planned interim analysis designed to exclude a doubling of CV risk compared to placebo (i.e., to rule out a hazard ratio of 2.0 using the upper bound of the 95%

confidence interval). This analysis was conducted based on 94 observed and adjudicated major adverse cardiovascular events ("MACE"), which was approximately 25% of the planned MACE for the Light Study (the "25% Interim Analysis"). *The 25% Interim Analysis was prospectively designed to enable an early and preliminary assessment of safety to support regulatory approval.* A larger number of MACE are required to precisely determine the effect of Contrave on CV outcomes.

24.     After providing further interim data findings, the 8-K included the following graph indicating a much lower incidence of cardiac events for participants receiving Contrave in the study than for those receiving the placebo:

**Figure 1. Time to First MACE at 25% Interim Analysis (ITT Population)**



Abbreviations: MACE, Major Adverse Cardiovascular Events; ITT, Intent to Treat.

25.     The Company's statements had their intended effect and the price of Orexigen common stock skyrocketed from its March 2, 2015 close of $5.79 per share to trade as high as $9.37 per share in intraday trading on March 3, 2015, closing that day at $7.64 per share, on highly unusual trading volume of more than 95.7 million shares.

26.     Later in the day on March 3, 2015, as reported by *Forbes*, an FDA official stated, in pertinent part, that the agency was not aware that the patent

1  applications contained specific interim study data and expressed "serious concerns"

2  about Orexigen's disclosure of the interim data.  The interim analysis was performed

3  after the 9,000-patient trial had achieved only 25% of its primary endpoint events

4  (MACE).  This analysis contained only 94 events: 59 in the placebo group and 35 in

5  the Contrave group.   However, endpoints with less than 100 total events are

6  statistically unreliable and must be viewed with extreme caution.  The FDA official

7  also stated that day that the agency had already "strongly urged Orexigen to protect

8  the interim data from public disclosure and [that the agency was] very disappointed by

9  Orexigen's actions."

10      27.    Later on March 3, 2015, Orexigen released a responsive statement to

11  *Forbes* (who first reported on the FDA's comments on the disclosure of the interim

12  trial data earlier on March 3, 2015) that stated in pertinent part as follows:

> "Orexigen conducted a large cardiovascular outcomes trial in order to file for approval, with the study planned to continue after approval to serve a postmarketing regulatory requirement for additional risk exclusion. *We observed an unexpected result in the interim analysis. We filed patent applications based on the results in order to preserve the potential for additional intellectual property*. During the course of the study, the FDA informed us it had determined that the Light Study would not serve as the postmarketing requirement for Contrave; a new trial would be required. At this point, the company decided to continue with the patent prosecution. The second cardiovascular outcomes trial is expected to start later this year, and we look forward to the results of that study which are anticipated by 2022.

> This morning the USPTO published the patent and supporting documentation, and we believed it was appropriate and necessary to make sure this information was equally available to all investors.

> Orexigen has been working closely with, and is committed to continuing to work with FDA and others to support its regulatory obligations to thoroughly explore Contrave's therapeutic profile. Just as important, Orexigen is committed to its obligation to patients to fully explore the drug's profile.

> Orexigen is also committed to simultaneously meeting its obligations to other regulatory authorities in the U.S., such as the SEC, and abroad, such as the EMA, which are relevant to, and have authority over, its business. *The Company is similarly committed to meeting its fiduciary duties to shareholders*."

28.   As reported by *The Wall Street Journal* in an article published at approximately 11 a.m. on March 4, 2015:

> *For the FDA, a basic principle is in play. The agency considers the preliminary data "far too unreliable to conclude anything further about cardiovascular safety" and is concerned that premature disclosure of positive results can undermine the LIGHT study. Why? Participants may want to drop out of the trial if they believe they are taking a placebo. And the FDA believes Orexigen should know this.*
>
> "In order to protect the integrity of an ongoing trial, preserving confidentiality of the interim results is essential,[*] the agency says in its statement. "The importance of maintaining confidentiality is well-articulated in International Conferences on Harmonization guidelines, FDA guidance, and the scientific literature."
>
> But why had the agency already conveyed concerns about disclosure to the drug maker? This was not the first time that LIGHT study data was disclosed inappropriately, according to the FDA. Prior to the Contrave approval last fall, the agency learned that Orexigen had shared interim study results with "more individuals than FDA considered necessary to prepare a regulatory submission."
>
> For this reason, the FDA last year decided that the LIGHT study should continue, but that Orexigen would have to launch a new study to satisfy the conditions of the approval of its Contrave drug. The LIGHT trial was designed to assess the extent to which the diet drug may increase the risk of a major cardiac event by 40% or more. Orexigen says this newly required trial will begin later this year.
>
> *Not surprisingly, the lead researcher for the study is upset. Steve Nissen, a cardiologist at the Cleveland Clinic, writes us that Orexigen had agreed to a "data access plan" with the trial's data monitoring committee that "strictly limited use of the data for a regulatory filing to FDA. Public disclosure of these incomplete data or use of data for business purposes was strictly forbidden by the agreement."*
>
> *Nissen, who says he was not aware of the interim study results until yesterday, says the disclosure was not approved by the data monitoring committee or the trial's executive committee. And he notes that Orexigen "business management" was not included in the list of individuals with approved access to the data.*

29.   However, due to the Company's response to the FDA's admonition on March 3, 2015, emphasizing that the interim data disclosure, while not expressly condoned by the FDA, was important and material information that the investment community should take heed of, the price of Orexigen stock closed up further on March 4, 2015 at $8.49 per share, again on unusually high trading volume of more

than 40.5 million shares, as the market continued to digest the positive news about the interim results.

30.    Defendants' statements set forth above in ¶¶23-24 and 27 were materially misleading when made because defendants mischaracterized the interim results of the LIGHT post-marketing trial of Contrave as demonstrating meaningful heart health benefits and their statements to *Forbes* later on March 3, 2015 emphasized that this was material information.

## THE TRUTH BEGINS TO BE REVEALED

31.    At approximately 2:02 p.m. on March 5, 2015, *Forbes* published a report entitled "Orexigen 'Crying All The Way To The Bank' After 'Egregiously Unethical' Actions." This *Forbes* report disclosed in pertinent part as follows:

> On Tuesday morning the members of the Data Monitoring Committee of Orexigen's Light study began a planned meeting in a hotel in Chicago. They had no way of knowing that in a few hours their routine duties would be completely interrupted by the news that data from the trial – which they thought was known only to them and a very few other people within the company and the FDA – had been revealed to the world by Orexigen. When the news sank in the meeting broke into a scene of high drama and emotion. "I've never seen anything like this in 20 years," said one participant. At one point, I've been told, the DMC members were reading my initial story about the data release on a monitor in the meeting room.

> The disclosure of the data unleashed a firestorm of criticism directed at Orexigen but also a dramatic 40% increase in the company's stock, adding about $400 million to Orexigen's market capitalization. But some believe that despite the short term gain ultimately there may be important negative consequences for the company and its leaders. Certainly the company hasn't made any friends this week at the FDA or among the doctors and statisticians who perform clinical trials.

> The Tuesday meeting was extraordinarily eventful, but in truth the DMC's activities throughout the trial had never been a day at the beach. The DMC was breaking new ground with the trial. ***Contrave was one of the first drugs to gain FDA approval with the help of data obtained from the interim analysis of an ongoing trial***. This is a novel and highly innovative process that many had hoped would help give new drugs a more speedy approval without a substantial increase in risk. Indeed, many have thought until now that all future obesity, diabetes, and perhaps even lipid drugs would likely go through this process.

> ***The first interim analysis, which took place in November 2013 after 25% of the trial's endpoint events had occurred, played an important role in helping the FDA decide to approve the drug in 2014.***

*But sometime after the meeting the FDA, and subsequently the DMC and members of the executive committee, became aware that the results of the interim analysis had been disclosed to a lot of people. In the words of the FDA, "unblinded interim results are expected to be shared only with the DMC and a select set of personnel, essential for a regulatory submission." Instead, the FDA found that Orexigen had given the results to more than 100 people, including "members of Orexigen's Board of Directors, who have financial interest in the outcome of the trial... the Orexigen CEO, investment bankers, and several representatives from Takeda Pharmaceuticals (including Corporate Communications, Chief Commercial Officer, and Head of Global Marketing)" and others whose names have been redacted from the FDA document.*

As a result of this disclosure the FDA decided that it could no longer rely solely on Light to provide a reliable assessment of the cardiovascular effect of Contrave. It said that Orexigen would have to also perform an entirely new trial to satisfy the requirement that it study the cardiovascular effects of Contrave.

But all the parties also agreed that the Light trial should continue. Although the trial's integrity had been damaged it was not clear if the damage would be fatal. *The biggest concern – that knowledge of the results would have a harmful effect as patients in the trial crossed over to open label Contrave or simply stopped trial participation altogether – might not be an issue as long as the early results didn't become more widely known.*

*In order to continue, however, the FDA, the trial executive committee, and the DMC insisted that Orexigen clam up and not repeat the breach of confidentiality. The company agreed, and everyone settled down to continue with the trial, satisfactorily or not.*

**Insidious Impact**

But the data disclosure had another, even more insidious and long-lasting impact. Armed with the positive findings of the interim analysis Orexigen's leaders decided that the preliminary finding of cardiovascular benefit was something for which the company could and should seek a patent. Because the two compounds that comprise Orexigen have been previously approved and are no longer on patent, Orexigen's intellectual property is based on the novel application of the drug combination to reduce weight. The new data adds the CV outcomes as a new indication, independent of weight loss.

*There is widespread speculation that Orexigen used the excuse of the patent filing to publicly reveal the interim results of the trial. According to this view, Orexigen benefits from the highly positive findings, despite the fact that all the experts agree that these preliminary results, based on only 94 events, are extremely unreliable and the positive effect will either disappear or diminish substantially as more events accrue.* If confirmed, the 41% reduction in major adverse cardiovascular events would place Contrave among the most effective cardiovascular drugs of all time. No one except company officials and deluded investors believes this kind of effect is likely.

- 11 -

*Disclosing the result, through the medium of a patent filing and an SEC disclosure, is a deeply cynical and manipulative action, they believe. "This is the most egregious ethical violation I've ever seen" in clinical trial conduct, said one source. In response to all the severe criticism they are "crying all the way to the bank."*

*The company signed an agreement that it wouldn't disclose the data to any persons outside of the small circle who were required to know for regulatory purposes. But this agreement turned out to be worthless when Orexigen leaders cynically ignored their commitment in favor of a quick buck, say critics.*

In its statement to the press Orexigen suggested that it had acted the way it did in order to meet "its fiduciary duties to shareholders." But it is precisely for this reason that company officials, including board members and other employees responsible for the business side of the company, should not have seen this data. By contrast, employees involved with the data handling have duties that are completely independent of these sort of business decisions. *"Here's the problem," said one source. "Most of these people should never have known. Everyone understood that if business people were given access to the data they might misuse it. They just signed the agreement and promptly ignored it."*

## Why The Trial Should Be Continued

Nevertheless, the Executive Committee and the DMC continue to believe that the trial should proceed as planned. It is not "ethically acceptable" to stop a trial for business or other reasons, said one trial investigator. To discontinue the trial now, they say, would represent a serious violation of the company's ethical obligation to the patient's [sic] who have volunteered to participate in the trial.

The *viability of the trial is a complicated issue.* The number of endpoint events has now more than doubled since the previous analysis. Tuesday's DMC meeting was in all likelihood the planned meeting for the analysis at the 50% mark of the trial. *But, I'm told, the trial will not reach the 400 or so endpoint events originally planned. Because of a lower than expected event rate the investigators now anticipate only reaching about 270 events. That lowers the statistical power of the trial, but that also means it may provide the best estimate that we will ever have of the CV effect of Contrave. Many believe that the second outcomes trial will not be able to provide an adequate answer, since patients who fail to lose weight on the trial will now have, or believe they will have, a strong reason to switch to open label Contrave.* Of course the same is true for the patients who are currently participating in LIGHT, but the trial leaders and DMC believe that with the current 200 events they have the best chance yet for the clearest assessment we are ever likely to get of the CV safety of Contrave. In any case, they say, whether the integrity of the trial has been irreversibly broken can't be known until after the trial is finished. At that point the investigators can look back at the drop-outs and crossovers and determine if the results are valid.

**Implications For Future Drug Approvals**

The Orexigen action now puts a big question mark on the fate of the highly promising plan to use data from interim analyses to bring drugs to market earlier. What will prevent other companies from following the Orexigen playbook? Given a look at promising early data is there any way for the company to resist the temptation to make hay while the sun seems to be shining? How can the FDA prevent this sort of action from occurring?

*"Orexigen threw the entire industry under the bus," said one source. "They may lose the ability to get early approval of drugs."*

*Most observers believe there is little the FDA or others can do to address the situation. One possibility is for the FDA to withdraw approval of the drug after concluding that the company is now unable to fulfill the post-approval requirement that it study the CV safety of Contrave.* But that would be a drastic measure that would be uncharacteristic of the FDA. (One theory is that the requirement to perform a second trial was actually a punitive measure by the FDA in response to the first data disclosure, since the FDA is keenly aware that the trial will probably not be able to answer the question of cardiovascular safety.)

32.     The trading price of Orexigen declined moderately during the afternoon of March 5, 2015 on these partial disclosures, falling from its opening that morning of $8.50 per share to close just above $8 per share.  However, because the FDA itself had not yet weighed in on the potential threat to Orexigen's Contrave drug development program, and the *Forbes* reporter and others had merely speculated on the potential detrimental effect these events would have on the Company's drug development program, the price of Orexigen continued trading at fraud-inflated prices through the close of trading on March 5, 2015.

33.     However, after the close of trading on March 5, 2015, *Forbes* published a second, more damning report entitled "*Top FDA Official Says Orexigen Study Result 'Unreliable,' 'Misleading.'*"  This second *Forbes* report directly quoted an FDA official as stating that the Company's repeated unauthorized disclosures had indeed threatened the entire Contrave drug development program, disclosing in pertinent part as follows:

*The study results showing that Orexigen's obesity drug Contrave reduced the risk of heart attacks and cardiovascular death and sent shares of the tiny La Jolla, Calif., biotechnology company soaring 30%*

- 13 -

*were probably "unreliable," "misleading," and "likely false," according to a top Food and Drug Administration official. If Orexigen cannot find a way to set things right, it could face fines, civil penalties, or even the withdrawal of Contrave from the market.*

John Jenkins is the director of the Office of New Drugs. He had a key role in negotiating the specifics of a big heart safety study of Contrave, as well as the safety of the guidance used to design big heart trials that are required of diabetes and obesity drugs. I interviewed him earlier today about the release of the Contrave data, which Orexigen released on Tuesday via a patent and a filing with the Securities and Exchange Commission over the protests of the FDA, the researchers leading the clinical trial, and its marketing partner, Takeda, and about Orexigen's earlier failure to keep the data confidential to even its own executives.

The idea behind these heart trials, which the FDA began requiring of obesity and diabetes drugs in 2008, is that a small, firewalled group of employees of the drug company is given early access to the data in order to show it to the FDA to show that the drug doesn't cause a big increase in cardiovascular events. Takeda followed this protocol with its diabetes drug, alogliptin. Jenkins says Sanofi actually withdrew a marketing application because it was afraid to compromise a trial of one of its diabetes drugs by letting interim data slip out.

Says Jenkins:

"The paradigm has always been that the interim analysis data must be kept very confidential so that it doesn't become available for business purposes within the company.

*And that's intended to:*

(1) *Make sure we don't do anything to compromise the integrity of completing the trial so we get the definitive answer on cardiovascular risk* and

(2) *It's based on the knowledge that when you're looking at a sample of only 25% of the data any estimates you get of the treatment effect of the drug are highly unreliable and can lead to false conclusions about either the safety or the efficacy of the drug.*

So our two concerns right now are:

(1) *Making sure that we can get the definitive answer about cardiovascular risk for Contrave, meaning that the required studies can be enrolled and completed in a timely manner,* and

(2) *We're concerned that physicians and patients not make healthcare decisions based on data that are highly unreliable. I characterized this earlier as trying to understand who is going to win a football game at the end of the first quarter. We have lots of examples where interim analyses can*

- 14 -

*give very misleading results compared to what the eventual outcome of the trial may be.*

Yes, he spoke in numerated bullet points, saying "number one" and "number two." When I asked him for examples, he referred me to a presentation that University of Washington statistician Thomas Fleming, the head of the Data Monitoring Committee that conducts interim analyses of the Contrave study made at an FDA meeting last August.

"Step back and think for a second," Jenkins says. "We required this study because we're concerned that Contrave may cause adverse cardiovascular events because of its effect on blood pressure and heart rate. So the likelihood that that drug is going to have an early benefit is highly unlikely. *So people need to be very cautious about making medical decisions based on these data, and we're very concerned that investigators and patients may be unwilling to be in a trial based on these data when they are likely false readings of the actual effect of the drug.*"

But the p values (a measure of statistical significance) released by Orexigen were very low. That usually means the result shouldn't have happened by chance. Doesn't that at least mean that it's unlikely that Contrave causes cardiovascular harm, and mean that the trial will probably be positive? *I think those are highly unreliable findings," Jenkins responded.* "I am not a statistician, but I can tell you that Dr. Fleming, who is a statistician, and the statisticians at the agency, and other people who are expert in this area will tell you the only thing you can really conclude with confidence from this trial is that excess cardiovascular risk is not two or greater. You have a 95% confidence that the excess risk is not two or greater. You also have 95% confidence that the actual point estimate of the effect of this drug [on cardiovascular events] is somewhere below two. So the finding of .59 at the interim is highly unreliable independent of the p value."

*So what can the FDA do about this*? It told Orexigen when Contrave was approved that it would need to do a second big study, because Orexigen had not kept the data fire walled, instead letting over 100 people, including people outside the company and Orexigen's CEO, learn about the results, according to FDA documents. *Now, because of the release of data via a press release, some experts question whether doctors or patients will be willing to participate in that second trial. What if it can't be completed?*

Jenkins said he wouldn't engage in "a hypothetical" and referred me to the FDA's guidance. I asked him to explain what the guidance means in a generic case, not specifically related to Orexigen.

*"Congress passed a law in 2007, FDAAA," Jenkins said. "They gave us the authority to require these trials. If companies are not meeting their obligations there are fines, there are civil money penalties, there's a possibility for seizure, and there's even a possibility for initiating withdrawal procedures."*

Documents released when the FDA approved Contrave say that the FDA had two problems with the Contrave heart trial. *One was that*

- 15 -

*Orexigen had allowed its data to leak out to far too many people to trust that it wouldn't change the final result of the trial.* The second was that too many patients (more than two thirds) had dropped off study drug. ***Both were concerns, Jenkins said.*** But the drop-outs were the result of something FDA had built into the study: because it wasn't clear that Contrave was safe, patients were not to stay on treatment (or placebo) unless they were losing weight. "***The main reason we no longer have confidence in this trial to be the definitive answer to this question is the unblinding,***" he says.

He used this issue to come back to his main point to doctors, patients, and (though he never mentions them) investors: Don't trust the data that Orexigen released. "It points out the paradox of people rushing to believe the interim point estimate, because going into this trial all the priors were about cardiovascular harm.   That shows the paradox of believing the interim analysis suggesting benefit."

34.    As a result of the FDA's March 5, 2015 statements challenging the legitimacy and continuation of the Company's Contrave drug development program, the price of Orexigen stock plummeted, dropping to below $7 per share in intraday trading on March 6, 2015, again on unusually high trading volume.  The stock closed at $7.10 per share on March 6, 2015, down $2.27 per share from its intraday Class Period high on March 3, 2015, erasing more than $280 million in market capitalization.

## LOSS CAUSATION/ECONOMIC LOSS

35.    During the Class Period, defendants made false and misleading statements by misrepresenting the materiality of the interim clinical data and engaged in a scheme to deceive the market.   Defendants' conduct artificially inflated Orexigen's stock price and operated as a fraud or deceit on the Class (as defined below).  Later, when defendants' prior misrepresentations were disclosed to market participants, Orexigen's stock price plummeted, as the prior artificial inflation came out of the stock price.  As a result of their purchases of Orexigen common stock during the Class Period, plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

36.     Plaintiff and the Class are entitled to a presumption of reliance.  During the Class Period, defendants made material misstatements and omissions that artificially inflated the price of Orexigen common stock.  Plaintiff and other members of the Class purchased Orexigen common stock between the time defendants issued their initial misstatements on March 3, 2015 and the time the true facts were disclosed on March 5, 2015, without knowledge of the misrepresented and omitted facts.  At all relevant times, the market for Orexigen common stock was efficient and the price of Orexigen common stock was impacted by defendants' misstatements and omissions.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

37.     Plaintiff incorporates ¶¶1-36 by reference.

38.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Orexigen common stock during the Class Period.

40.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orexigen common

stock.  Plaintiff and the Class would not have purchased Orexigen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

41.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Orexigen common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934
Act Against All Defendants**

42.    Plaintiff incorporates ¶¶1-41 by reference.

43.    During the Class Period, defendants acted as controlling persons of Orexigen within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Orexigen, the Individual Defendants had the power and ability to control the actions of Orexigen and its employees. Orexigen controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

44.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Orexigen common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their immediate families, directors and officers of Orexigen and their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Orexigen had more than 123.7 million shares of stock outstanding, owned by hundreds or thousands of

1 persons.  More than 136 million shares of Orexigen common stock were sold on
2 March 3 and 4, 2015 alone.

3      46.    There is a well-defined community of interest in the questions of law and
4 fact involved in this case.  Questions of law and fact common to the members of the
5 Class that predominate over questions that may affect individual Class members
6 include:

7         (a)    Whether the 1934 Act was violated by defendants;

8         (b)    Whether defendants omitted and/or misrepresented material facts;

9         (c)    Whether defendants' statements omitted material facts necessary in
10 order to make the statements made, in light of the circumstances under which they
11 were made, not misleading;

12         (d)    Whether defendants knew or recklessly disregarded that their
13 statements were false and misleading;

14         (e)    Whether the price of Orexigen common stock was artificially
15 inflated; and

16         (f)    The extent of damage sustained by Class members and the
17 appropriate measure of damages.

18      47.    Plaintiff's claims are typical of those of the Class because plaintiff and
19 the Class sustained damages from defendants' wrongful conduct.

20      48.    Plaintiff will adequately protect the interests of the Class and has retained
21 counsel who are experienced in class action securities litigation.  Plaintiff has no
22 interests which conflict with those of the Class.

23      49.    A class action is superior to other available methods for the fair and
24 efficient adjudication of this controversy.

25

26

27

28

1

## PRAYER FOR RELIEF

2      WHEREFORE, plaintiff prays for judgment as follows:

3      A.    Determining that this action is a proper class action, designating plaintiff

4 as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the

5 Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

6      B.    Awarding plaintiff and the members of the Class damages and interest;

7      C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

8      D.    Awarding such equitable/injunctive or other relief as the Court may deem

9 just and proper.

10

## JURY DEMAND

11      Plaintiff demands a trial by jury.

12 DATED: March 10, 2015         ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
13                                          DAVID C. WALTON

14

15                                        *s/ David C. Walton*
                                        DAVID C. WALTON
16

17                                        655 West Broadway, Suite 1900
                                        San Diego, CA 92101-8498
18                                        Telephone: 619/231-1058
                                        619/231-7423 (fax)
19

20                                        ROBBINS GELLER RUDMAN
                                               & DOWD LLP
21                                        SAMUEL H. RUDMAN
                                        MARY K. BLASY
22                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
23                                        Telephone: 631/367-7100
                                        631/367-1173 (fax)

24

25

26

27

28

1

2        JOHNSON & WEAVER, LLP
         FRANK J. JOHNSON
3        600 West Broadway, Suite 1540
         San Diego, CA  92101
4        Telephone:  619/230-0063
         619/255-1856 (fax)

5        Attorneys for Plaintiff

6    I:\Admin\CptDraft\Securities\Cpt Orexigen.docx

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: 7D44E932-A563-434E-BB2A-57DBC63104EF

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Lisa Colley, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint and authorize its filing.

2.  I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  I made the following transactions during the Class Period in the securities that are the subject of this action.

See Attached

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: 7D44E932-A563-434E-BB2A-57DBC63104EF

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of March 2015.

DocuSigned by:

Lisa Coney

## Statement of Ownership

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 3/4/2015 | 1,530 | $8.49 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 3/6/2015 | 1,530 | $6.81 |
| | | |
| | | |
| | | |
| | | |
| | | |