KAHN SWICK & FOTI, LLP
RAMZI ABADOU (222567)
912 Cole Street, # 251
San Francisco, CA 94117
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel for Lead Plaintiff and the Putative Class*

BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

*Liaison Counsel for Lead Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KARIM KHOJA; on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OREXIGEN THERAPEUTICS, INC., JOSEPH P. HAGAN, MICHAEL A. NARACHI, and PRESTON KLASSEN<br><br>Defendants.<br><br>AND ALL CONSOLIDATED CASES | No. 3:15-cv-00540 JLS (KSC)<br><br>CLASS ACTION<br><br>CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


TABLE OF ACRONYMS .......... iii

I. NATURE OF THE ACTION .......... 1

II. OVERVIEW of the action .......... 4

- A. The FDA Admonishes Orexigen for Violating Its LIGHT Study Confidentiality Obligations and the Insider Defendants Engage in a Scheme to Circumvent the FDA .......... 4
- B. Defendants' Materially Misleading Class Period Statements and Omissions .......... 8
- C. The Full Truth Is Finally Revealed .......... 11

III. JURISDICTION AND VENUE .......... 13

IV. PARTIES .......... 13

- A. Plaintiff .......... 13
- B. Corporate Defendant .......... 14
- C. Insider Defendants .......... 14

V. VIOLATIONS OF THE EXCHANGE ACT .......... 18

- A. Substantive Allegations .......... 18
  - 1. Applicable Regulatory Background .......... 18
  - 2. The FDA-Mandated LIGHT Study .......... 19
  - 3. The FDA Condemns Orexigen's Leak of Interim LIGHT Study Data .......... 23
  - 4. Defendants' Patent Scheme .......... 25
  - 5. The Cleveland Clinic Terminates the LIGHT Study .......... 31
  - 6. The Insider Defendants Personally Benefitted from Their Misconduct .......... 32
    - **a) Magnitude of Personal Benefit** .......... 33
    - **b) Timing of Personal Benefit** .......... 35
- B. Defendants' Materially False and Misleading Class Period Statements and Omissions .......... 36

1. *Orexigen's Current Report on Form 8-K* (March 3, 2015) .....36

2. *Orexigen's Press Release* (March 3, 2015) .....40

3. *Orexigen's Current Report on Form 8-K* (May 8, 2015) .....44

4. *Orexigen's Quarterly Report on Form 10-Q* (May 8, 2015) .....45

5. *Orexigen's 1Q 2015 Earnings Conference Call* (May 8, 2015).....46

VI. LOSS CAUSATION AND ECONOMIC LOSS .....49

A. The March 5, 2015 Disclosure Events Corrected Defendants' Materially False and Misleading March 3, 2015 Statements and Omissions.....51

B. The May 12, 2015 Disclosure Events Corrected Defendants' Materially False and Misleading March 3, 2015 and May 8, 2015 Statements and Omissions .....54

VII. APPLICABILITY OF PRESUMPTION OF RELIANCE .....63

VIII. NO SAFE HARBOR.....64

IX. CLASS ACTION ALLEGATIONS.....65

X. CLAIMS FOR RELIEF.....66

XI. PRAYER FOR RELIEF .....69

XII. JURY DEMAND.....70

## TABLE OF ACRONYMS

| Acronym | Definition |
|---|---|
| CHMP | Committee for Medicinal Products for Human Use (European) |
| CMA | Centralized Marketing Authorization |
| CRL | Complete Response Letter |
| CRO | Contract Research Organization |
| CV | Cardiovascular |
| CVD | Cardiovascular Disease |
| CVOT | Cardiovascular Outcomes Trial |
| DAP | Data Access Plan |
| DMC | Data Monitoring Committee |
| DSMB | Data Safety & Monitoring Boards |
| DSMC | Data Safety & Monitoring Committee |
| EC | European Commission |
| EMA | European Medicines Agency |
| ESC | Executive Steering Committee |
| FDAAA | Food and Drug Administration Amendments Act of 2007 |
| IND Application | Investigational New Drug Application |
| MAA | Marketing Authorization Application |
| MACE | Major Adverse Cardiac/Cardiovascular Events |
| NDA | New Drug Application |
| OND | Office of New Drugs |
| PDUFA | Prescription Drug User Fee Act |
| ROW Partnership | Rest of the World Partnership |
| USPTO | United States Patent and Trademark Office |

*"Patients were misled, investors were misled."*[1]
Steven Nissen, M.D.

## I. NATURE OF THE ACTION

1. This is a putative class action for violation of the federal securities laws. Lead Plaintiff Karim Khoja ("Lead Plaintiff" or "Plaintiff") by and through his undersigned counsel ("Lead Counsel"), brings this action pursuant to the Securities Exchange Act of 1934 (the "Exchange Act").

2. Lead Plaintiff's claims are brought on behalf of: (i) all persons who purchased or otherwise acquired the publicly-traded securities of Orexigen between March 3, 2015 and May 12, 2015, inclusive (the "Class Period"), and were damaged by the conduct asserted herein (the "Class"). Plaintiff asserts violations of §§10(b) and 20(a) of the Exchange Act, and Securities and Exchange Commission ("SEC") Rules 10b-5(a)-(c), promulgated thereunder. Defendants are (i) Orexigen; (ii) Orexigen Chief Executive Officer ("CEO") Michael A. Narachi ("Narachi"); (iii) Orexigen Chief Financial Officer ("CFO") Joseph "Jay" Hagan ("Hagan"); and (iv) Orexigen Head of Global Development, Preston Klassen ("Klassen") (collectively,

---

1 *Forbes*, "A Top Cardiologist Says a Diet Drug Maker Misled Patients and Investors" (May 12, 2015). Dr. Nissen is Department Chair of Cardiovascular Medicine at the Cleveland Clinic and Chair of the Executive Steering Committee ("ESC") for the FDA-mandated cardiovascular outcomes trial ("CVOT") of Orexigen Therapeutics, Inc.'s ("Orexigen" or the "Company") obesity drug, Contrave. As Chair of the ESC, Dr. Nissen oversaw the LIGHT Study, a Food and Drug Administration ("FDA") mandated randomized, double-blind, placebo-controlled clinical trial designed to assess the cardiovascular ("CV") risks associated with Contrave. In 2007, Dr. Nissen was named one of the "100 Most Influential People" in the world by *Time Magazine*. He has authored more than 350 journal articles and book chapters, mostly in the cardiovascular field.

"Defendants"). Defendants Narachi, Hagan, and Klassen are referred to collectively herein as the "Insider Defendants."

3. Lead Plaintiff's allegations are based upon Lead Counsel's investigation, except as to the allegations specifically pertaining to Plaintiff, which are based upon his personal knowledge. Lead Counsel's investigation included, among other things, a review of Orexigen's: (i) public filings with the SEC and United States Patent and Trademark Office ("USPTO"); (ii) press releases and other public statements made by Orexigen and the Insider Defendants; (iii) analyst, media and regulatory reports by, *inter alia*, the FDA concerning the Company; (iv) publicly-available trading data; and (v) discussion(s) with (a) Steven Nissen, M.D.; (b) the Cleveland Clinic's Deputy Chief Legal Officer; and (c) other third parties.

4. This case involves a series of decisions by the Insider Defendants that placed their own personal financial goals over their securities law disclosure obligations concerning Orexigen's primary drug prospect, Contrave. The Company's SEC filings readily acknowledged at all relevant times that its "success for the foreseeable future is dependent solely on the success of our recently approved product, Contrave…." Throughout the Class Period, as alleged herein, Defendants actively misled investors, the FDA and the Company's business and academic partners about an FDA-mandated clinical trial for Contrave called the LIGHT Study. *See* §V.A-B., *infra*.

5. When the truth about Defendants' materially misleading statements and omissions became known in two related negative disclosure events about the LIGHT Study, the value of the Company's securities plummeted on virtually unprecedented volume. As alleged herein, the loss causing disclosures on March 5, 2015 revealed the truth to the market about Defendants' March 3, 2015 materially false and

misleading statements and omissions.[2] Further, as alleged herein, the loss causing disclosures on May 12, 2015 revealed the truth to the market about Defendants' materially false and misleading statements and omissions on March 3, 2015 and May 8, 2015. In response to the disclosures on March 5, 2015 and May 12, 2015, Orexigen's share price fell precipitously. *See* §VI., *infra*. On May 13, 2015, the day after the Class Period ends, *Seeking Alpha* published an article entitled "Orexigen's Double Standard Is Fertile Ground for Legal Action," that succinctly summed up Defendants' Class Period misconduct as follows:

- "On March 3, 2015, Orexigen ***wrongfully released*** LIGHT trial data claiming it was positive 'material news' that required an 8-K filing;"
- "Today, we learn that Orexigen ***suppressed the release*** of negative LIGHT trial data for more than a month;"
- "Why did Orexigen ***fail to file*** an 8-K for what has essentially negated the claims made in the first one?"[3]

6. Defendants engaged in their fraudulent course of business conduct to, *inter alia*, recklessly promote Contrave's prospects to the market and to satisfy their self-interested executive compensation targets. *See* §V.A.6., *infra*. As a result of Defendants' wrongful acts and omissions as alleged throughout herein, and the precipitous decline in the market value of the Company's securities, Plaintiff and other putative class members have suffered significant losses and damages.

---

[2] *See* ECF No. 110 at 36 (holding that "Lead Plaintiff adequately alleges loss causation as to the March 5, 2015 corrective disclosure.").

[3] All emphasis added and internal citations omitted unless otherwise noted.

## II. OVERVIEW OF THE ACTION

### A. The FDA Admonishes Orexigen for Violating Its LIGHT Study Confidentiality Obligations and the Insider Defendants Engage in a Scheme to Circumvent the FDA

7. Orexigen is a developmental stage biotechnology firm. The Company focuses on the development of pharmaceutical product candidates for the treatment of obesity. Its primary product candidate is Contrave, and Orexigen's share price was at all relevant times extremely sensitive to public developments about the drug. Contrave has completed Phase III clinical trials and was being studied in a drug trial known as the LIGHT Study. The Company has a collaboration agreement with Takeda Pharmaceutical Company Limited ("Takeda") to develop and commercialize Contrave in the United States, Canada, and Mexico.

8. The LIGHT Study is an FDA-mandated randomized, double-blind, placebo-controlled clinical trial designed to assess the cardiovascular risks associated with Contrave.[4] The FDA required Orexigen to conduct the study because Contrave is designed to treat overweight and obese persons already at high risk for major adverse cardiovascular events ("MACE"). Specific quantitative interim LIGHT Study data and results were at all relevant times required to be kept strictly confidential to ensure that LIGHT Study researchers could obtain definitive answers on Contrave's cardiovascular risks without the bias created by unauthorized leaks of interim data (*see*, *e.g.*, ¶47, *infra*). Defendants knew that any release of specific

---

[4] A blinded study ensures that patients do not know what treatment they are receiving to confirm that the results are not affected by a placebo effect. In a double-blind study – like the LIGHT Study – neither the participants nor the researchers know which participants belong to the control group, or the test group.

interim data would result in the possible termination of the LIGHT Study and/or other sanctions by the FDA.

9. In a public acknowledgement that Orexigen was required to keep interim LIGHT Study data confidential, Defendant Narachi publicly assured investors in November 2013 that interim LIGHT Study research data would remain secret except for a small team at the Company that would use it to file for approval with the FDA – stating "***[w]e're going to honor the integrity of that blind so we don't screw it up and get the final analysis***."[5] The same month, however, LIGHT Study researchers discovered that Orexigen had inappropriately leaked positive interim data to an unprecedented extent, including to a select group of Wall Street investment banks. In December 2013, with the assistance of such investment banks serving as underwriters, Defendants consummated a $100+ million private securities offering.

10. According to an FDA "Center for Drug Evaluation and Research" report detailing Defendants' widespread leak, the Insider Defendants had improperly revealed 25% interim data showing a purported heart benefit to "more than ***100*** individuals who had knowledge of the interim results or access to unblinded interim data."[6] On June 4, 2014, the FDA held a meeting with Orexigen "to discuss [the FDA's] significant concerns and the implications that the release of data may have on the approvability of the [Contrave] application." The FDA's Director of the

---

5 *Forbes*, "Orexigen Obesity Drug Gets a Good Checkup. But Will It Sell?" (November 25, 2013).

6 FDA Memorandum of Meeting citing an internal April 16, 2014 email from Orexigen (June 4, 2014). "25%" or "50%" refers to the amount of data collected based on the analysis of enrolled patients in the LIGHT Study.

Office of New Drugs ("OND"), John Jenkins, M.D., attended the meeting along with Defendants Narachi and Klassen and Orexigen's ***then*** General Counsel, Heather D. Turner. During the meeting, the FDA harshly criticized Defendants for violating their secrecy obligations, stating, *inter alia*, that:

- "This is the ***first time*** the Agency has encountered a situation with this extent of sharing of unblinded data or interim results from an ongoing trial."

- "The [Orexigen] corporate leaders and CEO should remain external and their knowledge of interim results is a ***concern***."

- "The unblinding ***violated*** the company's DAP [data access plan]....Orexigen did not seek advice from FDA or the DMC chair prior to data sharing."

11. As a sanction for the Company's leak, four Orexigen executives – including Defendant Klassen – were required to sign a fourteen-page agreement forbidding the Company from again disclosing interim LIGHT Study results (the "FDA Agreement"). The FDA Agreement obligated Defendants to take extreme measures to ensure that only a carefully selected regulatory team at Orexigen would have access to LIGHT Study interim results. Given the LIGHT Study's importance to the Company's prospects, Orexigen also agreed to keep specific areas of the Company's offices locked to maintain secrecy, and to ensure that its team would not use the Company's corporate email system to communicate about the results.

12. Despite the FDA specifically instructing Defendants not to release any further interim LIGHT Study data, Defendants Narachi and Klassen embarked on a deliberately reckless scheme to circumvent the FDA and to make the data public through the filing of a U.S. patent. On July 2, 2014, and unbeknownst to the FDA, Dr. Nissen or LIGHT Study researchers, Orexigen filed patent application 14/322,810 with the USPTO (the "2014 Patent Application"). As part of the

application, Defendant Klassen intentionally included specific quantitative 25% interim LIGHT Study data showing that Contrave produced a purported heart benefit that he knew Orexigen was prohibited from disclosing. Initially, the Company filed the application pursuant to a statutory "nonpublication" request providing that "applications for patents shall be kept in confidence by the Patent and Trademark Office and no information concerning the same given without authority of the applicant.…"[7]

13. The Company's "nonpublication" request was designed to and did enable Defendants to conceal the 2014 Patent Application from the FDA and Dr. Nissen until after the FDA approved Contrave. Had the FDA or Dr. Nissen discovered that the Company had included specific interim data in the 2014 Patent Application, the FDA would never have approved Contrave in 2014. In turn, the Insider Defendants would have lost substantial bonuses and stock option awards tied directly to Contrave's approval in the U.S. that year. *See* §V.A.6., *infra*.

14. The FDA approved Contrave in September 2014. In early January 2015, after the dust had settled over the Company's prior confidentiality breach, Defendants Narachi and Klassen subsequently ***rescinded*** the Company's nonpublication request to have the USPTO accomplish for Defendants indirectly what they knew they were prohibited from again doing directly – namely, revealing seemingly positive, but statistically suspect, 25% interim LIGHT Study data. After Orexigen's outside intellectual property counsel filed a "Rescission of Previous Nonpublication Request" in early January 2015, on January 8, 2015 the USPTO responded with a "Notice of New or Revised Projected Publication Date" remarking

[7] *See* 35 U.S.C. §122.

that a "secrecy order has been rescinded and the application is ***now in the publication queue***."

**B. Defendants' Materially Misleading Class Period Statements and Omissions**

15. The USPTO published the patent on March 3, 2015. The Company thereafter immediately filed a same-day Current Report on Form 8-K with the SEC announcing that the USPTO had published the 2014 Patent Application. Defendant Hagan signed the Form 8-K. As intended, the Company's Form 8-K revealed the 25% interim LIGHT Study data that purported to show that Contrave did not increase the risk of heart attacks, and actually prevented them. Orexigen filed the Form 8-K without first consulting with the FDA, Dr. Nissen or its own business partner, Takeda.

16. Defendants' filing had its intended effect, as shares of the Company's common stock soared almost 32%, to close at $7.64 on March 3, 2015 on enormous trading volume of more than 95.8 million shares traded.[8] On March 4, 2015, as investors continued to digest the 25% LIGHT Study results, shares of Orexigen's common stock rose an additional 11% on massive volume, to close at $8.49 per share.

17. In addition to artificially inflating the price of Orexigen's securities, Defendants' publication of the misleading 25% interim LIGHT Study results also had the intended effect of deceiving analysts and investors. On March 3, 2015, Piper Jaffray issued a report remarking that the 25% interim results were "***surprisingly positive***" and could "turn the obesity/metabolic syndrome market ***on its head***." On

---

[8] The average daily trading volume for shares of Orexigen's common stock is approximately 3 million shares traded daily.

March 4, 2015 Wells Fargo analyst Matthew J. Andrews similarly characterized the interim LIGHT Study data as "the '***holy grail***' for treating cardiometabolic diseases [which] is demonstration of a CV mortality benefit, which to date has not been demonstrated by an obesity therapeutic…." If the 25% Interim LIGHT Study results the Company improperly released on March 3, 2015 were confirmed, the reduction in major adverse cardiovascular events would place Contrave among the most effective cardiovascular drugs of all time.

18. On March 5, 2015, however, Dr. John Jenkins, the FDA's director of the OND, took the unprecedented step of condemning Orexigen's SEC filing as "***unreliable***," "***misleading***," and "***likely false***" in a report published after the close of trading that day.[9] Dr. Jenkins explained that the Company's release of the 25% results violated Orexigen's confidentiality obligations and had compromised the LIGHT Study's integrity. In a lengthy statement, the FDA said it was unaware that Orexigen's 2014 Patent Application contained specific interim study data and expressed "serious concerns" about Orexigen's confidentiality breach.

19. On this and other related news, shares of Orexigen's common stock slid almost 6%, to close at $8.01 on March 5, 2015 and as much as $1.25, or almost 16%, to as low as $6.76 in intraday trading on March 6, 2015 as investors began to digest the impact of Defendants' deliberately reckless statements and conduct.

20. On March 13, 2015, Defendants Narachi and Klassen filed a Registration Statement on Form S-8 with the SEC registering six million Orexigen shares at an artificially inflated price of $7.08 ("2015 Registration Statement"). The 2015 Registration Statement was filed pursuant to the Company's 2007 Equity

---

[9] *Forbes*, "Top FDA Official Says Orexigen Study Result 'Unreliable,' 'Misleading'" (March 5, 2015).

Incentive Award Plan and took advantage of the artificial inflation in the Company's stock price generated by the Company's improper March 3, 2015 SEC filing as alleged in ¶85, *infra*.

21. Then, on March 26, 2015, while the Company's securities remained artificially inflated after the Company announced that Contrave had received marketing authorization in Europe (*see* ¶72, *infra*), the LIGHT Study's Executive Steering Committee, chaired by Dr. Nissen, informed Defendants that: (i) the ESC had voted ***unanimously*** to halt the LIGHT Study as a result of Defendants' improper March 3, 2015 disclosure breach; and (ii) the purported heart benefit the Company recklessly touted just weeks earlier based on 25% interim data had ***vanished*** once more mature 50% interim data was analyzed. Each of the Insider Defendants learned of these negative material facts and/or deliberately disregarded them no later than March 26, 2015. That same day, Dr. Nissen sent Orexigen and Takeda a simple draft press release to disclose these negative developments to patients, physicians and investors. Takeda immediately approved the release but, despite the materiality of the information to the Company's shareholders, Orexigen inexplicably blocked it.

22. Defendants Narachi and Klassen thereafter took active steps to delay and suppress disclosure of these new highly material developments for over six weeks. Over that same time period, the Insider Defendants not only: (i) continued to recklessly tout the misleading 25% interim results in private meetings with analysts (*see, e.g.*, ¶99); but (ii) conducted a quarterly earnings conference call where they: (a) affirmatively misrepresented that ***no*** decision about terminating the LIGHT Study had been made; and (b) concealed the truth about what the 50% data demonstrated about Contrave. *See* §V.B.5., *infra*.

23. During the same earnings call, Mark Booth, the Company's then Chief Commercial Officer, announced his resignation from Orexigen.

### C. The Full Truth Is Finally Revealed

24. Two business days after the Company hosted its 1Q 2015 earnings call, on May 12, 2015 Orexigen was compelled to, in Dr. Nissen's words, "tell the truth." That day, Defendants learned that the Cleveland Clinic and Dr. Nissen were issuing a press statement revealing that the LIGHT Study had been terminated, and that the 50% interim LIGHT Study data demonstrated that the 25% data Defendants published on March 3, 2015 was false. Minutes before they issued the release, Orexigen quickly put out its own press release finally disclosing, for the first time, that the LIGHT Study had been terminated. The Company's press release, however, failed to disclose the true facts about the more mature 50% LIGHT Study data even though Defendants Narachi and Klassen had been shown the data on March 26, 2015. Instead, Orexigen misleadingly represented that "[t]oday some of the 50% interim analysis of the LIGHT Study was disclosed by a third party [*i.e.*, Dr. Nissen and the Cleveland Clinic]. Because ***most*** of our management team remains blinded to the 50% data, ***we are unable to comment***."

25. On May 12, 2015, Dr. Nissen publicly condemned the Company's Class Period misconduct in a published *Forbes* article, bluntly remarking that "***investors*** [had been] ***misled***" by Orexigen.[10] The same article described how Orexigen had "sought to block the release of the new [50% interim LIGHT Study] data. On March 26, 2015, the study's executive committee voted unanimously that the study should be stopped and the data publicized. But for six weeks Orexigen repeatedly refused to approve a press release.…" Also on May 12, 2015, Takeda initiated dispute

---

[10] *Forbes*, "A Top Cardiologist Says a Diet Drug Maker Misled Patients and Investors" (May 12, 2015).

resolution proceedings against Orexigen demanding it pay the full cost – estimated at $200 million – of the new CVOT required by Orexigen's improper data disclosure.

26. The same day, *Medscape* published an article entitled "LIGHT Stopped: Contrave CVD Safety Study Halted Following Premature Release of Data" that quoted Dr. Nissen saying: "***[w]e had a duty to the public and also to the investment community[,] to tell the truth***." As a result of these and other related negative disclosures that revealed to the market for the first time the truth about Defendants' materially false and misleading March 3, 2015 and May 8, 2015 statements and omissions, the price of Orexigen's common stock plunged approximately 25% from an opening price on May 11, 2015 of $6.75 to close on May 13, 2015 at $5.02 on enormous volume as the full truth regarding Defendants' Class Period misrepresentations was finally revealed as depicted in the chart below:




27. Despite Defendant Narachi's and Klassen's May 8, 2015 material misrepresentation that the LIGHT Study was ongoing, on May 12, 2015, the last day of the Class Period, the Company issued an Orwellian-like statement suggesting that

Orexigen was actually "***pleased*** that the LIGHT Study is now being terminated and want[ed] to thank the patients and all of those involved in the study."

28. Finally, on June 2, 2015 the Company's General Counsel Heather D. Turner suddenly and unexpectedly (but not surprisingly given her presence at the Company's polluted May 8, 2015 earnings call) announced her immediate resignation from Orexigen.

## III. JURISDICTION AND VENUE

29. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b), §78t(a), and §78t-1), and Rules 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

30. Venue is proper in this District pursuant to Section 27 of the Exchange Act. Orexigen's headquarters are located within this District, the Company conducts substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

31. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and national securities markets.

## IV. PARTIES

### A. Plaintiff

32. Lead Plaintiff purchased Orexigen securities during the Class Period as described in his Certification attached hereto, and incorporated herein by reference, and suffered damages thereon. Lead Plaintiff held the Orexigen shares he purchased during the Class Period through the negative May 12, 2015 disclosures directly

related to the negative March 5, 2015 disclosures about the Company, as alleged herein.

**B. Corporate Defendant**

33. Defendant Orexigen is a Delaware company headquartered and operating in the 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037. Orexigen is a small company with only approximately fifty employees and its shares trade on the NASDAQ under the ticker symbol "OREX."

**C. Insider Defendants**

34. Defendant Michael A. Narachi has served at all relevant times as the Company's President and CEO and a Director. Because of his senior position with Orexigen, Defendant Narachi had the power and authority to control the contents of press releases, investor and media presentations and all filings Orexigen made with the SEC during the Class Period. Defendant Narachi certified the Company's periodic financial report filed with the SEC during the Class Period and regularly spoke with investors and securities analysts about the Company. Defendant Narachi has acknowledged that he was a hands-on manager that wanted to be involved in all aspects of the Company's operations, including the conduct of the LIGHT Study (*see* ¶52, *infra*).

35. Defendant Narachi signed the Company's: (i) Quarterly Report on Form 10-Q for 4Q 2014 that Orexigen was caused to file with the SEC on November 10, 2014 ("4Q 2014 10-Q"); (ii) Annual Report on Form 10-K for fiscal year ended December 31, 2014 that Orexigen was caused to file with the SEC on February 27, 2015 ("2014 Annual Report"); (iii) 2015 Registration Statement; (iv) Quarterly Report on Form 10-Q for 1Q 2015 that Orexigen was caused to file with the SEC on May 8, 2015 ("1Q 2015 10-Q"); and (iv) the Company's Proxy Statements filed on Schedule 14-A's with the SEC on April 30, 2014 and April 22, 2015. He also

participated on and made statements during the Company's May 8, 2015 1Q 2015 earnings conference call with investors and analysts.

36. Defendant Joseph P. Hagan has served at all relevant times as the Company's Chief Business Officer, Treasurer and Acting CFO. Because of his senior position with the Company, Defendant Hagan had the power and authority to control the contents of press releases, investor and media presentations and all filings Orexigen made with the SEC during the Class Period. Defendant Hagan certified the Company's periodic financial report filed with the SEC during the Class Period and regularly spoke with investors and securities analysts about the Company.

37. Defendant Hagan signed the Company's: (i) 4Q 2014 10-Q; (ii) 2014 Annual Report; (iii) Current Report on Form 8-K that Orexigen was caused to file with the SEC on March 3, 2015; (iv) Current Report on Form 8-K that Orexigen was caused to file with the SEC on March 26, 2015; (v) Current Report on Form 8-K that Orexigen was caused to file with the SEC on May 8, 2015; (vi) 2015 Registration Statement; and (vii) 1Q 2015 10-Q. He also participated on and made statements during the Company's May 8, 2015 1Q 2015 earnings conference call with analysts and investors.

38. During the Class Period, Defendant Preston Klassen served as the Company's Head of Global Development. The Company's filings with the SEC represent that Defendant Klassen was, at all relevant times, responsible for "[l]ead[ing] efforts to obtain Contrave approval by the FDA." Defendant Klassen spoke with investors and securities analysts regarding the Company on a regular basis. Because of his senior position with the Company, Defendant Klassen had the power and authority to control the contents of press releases, investor and media presentations and all filings Orexigen made with the SEC during the Class Period. Defendant Klassen also participated on and made statements during the Company's

February 25, 2015 4Q 2014 and May 8, 2015 1Q 2015 earnings calls with analysts and investors.

39. Each Insider Defendant made materially misleading statements during the Class Period by speaking on earnings conference calls, signing the Company's SEC filings and/or making presentations to investors. The Insider Defendants were, at all relevant times, members of Orexigen's "Senior Management Team" and possessed the power and authority to control the contents of Orexigen's press releases, investor and media presentations and SEC filings. The Insider Defendants were also intimately involved with and aware of, or deliberately disregarded, all aspects of the Company's operations.

40. Because of their positions within the small Company, the Insider Defendants each had access to the adverse undisclosed information about Orexigen's business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them. The Insider Defendants, by virtue of their respective high-level positions, were directly involved in the day-to-day operations of Orexigen at the highest levels.

41. The Insider Defendants each bear responsibility for the accuracy of the public reports and press releases detailed herein, and is therefore primarily liable for the misrepresentations and omissions contained therein. The Insider Defendants substantially participated in and had exclusive authority and control over the content of Orexigen's false and misleading statements and how they were communicated to investors. They also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Orexigen's misleading statements, all of which made it necessary or inevitable that

material misrepresentations and omissions would be communicated to, and mislead, investors.

42. The federal securities laws obligated the Insider Defendants to refrain from falsifying Orexigen's records and prohibited them from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. The Insider Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Orexigen's securities.

43. Each of the Insider Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Orexigen securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Orexigen's operations. Defendants' scheme deceived the investing public regarding Orexigen's operations and the intrinsic value of Orexigen's securities, and caused Plaintiff and other members of the putative Class to be damaged as a result of their purchases of Orexigen securities at artificially inflated prices.

44. The Company's press releases and SEC filings were group-published documents, representing the collective actions of the Company's "Senior Management Team." The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these

statements, in violation of the federal securities laws. Each Insider Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance, or cause them to be corrected.

# V. VIOLATIONS OF THE EXCHANGE ACT

## A. Substantive Allegations

### 1. Applicable Regulatory Background

45. On September 27, 2007, President George W. Bush signed into law H.R. 3580, the Food and Drug Administration Amendments Act of 2007 ("FDAAA"). The FDAAA represented a significant, welcomed addition to FDA authority designed to ensure that FDA staff had the necessary resources to conduct complex and comprehensive reviews necessary for new drugs like Contrave. The FDAAA grants the FDA the authority to require a drug-specific risk evaluation mitigation strategy to ensure the benefits of a drug outweigh its risks.

46. The purpose of such studies is to assess a known serious risk or signals of serious risk related to a drug or to identify an unexpected such risk. All clinical trials require safety monitoring, but not all trials require monitoring by a formal committee external to the trial organizers, sponsors and investigators. DMC's (or data monitoring committees) are generally established for large, randomized multisite studies, like the LIGHT Study, that evaluate treatments intended to prolong life or reduce risk of a major adverse health outcome such as a cardiovascular event. Unblinded interim data and the results of comparative interim analyses are to remain confidential.

47. Sponsors like Orexigen and Takeda address such confidentiality issues in written agreements between the sponsor and members of the DMC, as well as written agreements between the sponsor and investigators. Sponsor exposure to

unblinded interim data, through the DMC or otherwise, can present substantial risk to the integrity of the trial. FDA guidelines establish that maintaining confidentiality of interim results from a trial like the LIGHT Study is essential to maintain the integrity and credibility of an ongoing clinical trial. Knowledge of interim results by those involved in the conduct of the trial or the trial's participants can have many adverse effects, such as slowing recruitment, promoting dropouts or cross-ins, introducing bias with regard to outcome assessment or safety-related events, and amending the design of the trial itself based on interim knowledge.

48. The consequences of leaking interim results are well articulated, long-established and were known or deliberately disregarded by the Insider Defendants. As far back as the FDA's 2006 Guidance for Clinical Trial Sponsors called "Establishment and Operation of Clinical Trial Data Monitoring Committees" stated, for instance, that "[k]nowledge of unblinded interim comparisons from a clinical trial is generally not necessary for those conducting or sponsoring the trial; further such knowledge can bias the outcome of the study by ***inappropriately influencing its continuing conduct*** or the plan of the analyses."

**2. The FDA-Mandated LIGHT Study**

49. Orexigen received a complete response letter ("CRL") from the FDA regarding its new drug application ("NDA") for Contrave in January 2011. The CRL mandated that, before the NDA could be approved, Orexigen had to conduct an expensive randomized, double-blind, placebo-controlled trial of sufficient size and duration to demonstrate that the risk of major cardiac events in overweight and obese patients treated with Contrave did not adversely affect the drug's risk-benefit profile. In the months immediately following Orexigen's receipt of the CRL, the Company began a formal appeal process with the FDA to determine whether another less burdensome path to regulatory approval for Contrave was possible. In June 2011,

following an unsuccessful meeting between Orexigen and the FDA, the Company announced that it was ceasing Contrave's development. After the Company's share price declined dramatically and Defendants' overall prospects had dimmed, however, Orexigen revived efforts to have Contrave approved.

50. In September 2011, following a meeting with senior officials in the FDA's OND, Orexigen received written correspondence from the director of the OND detailing its design requirements for a cardiovascular outcomes trial for Contrave that would address the CRL. In February 2012, Orexigen announced that it had reached agreement with the FDA on a "Special Protocol Assessment" for the Contrave outcomes trial to demonstrate that Contrave did not unacceptably increase the risk of MACE. The trial was called the LIGHT Study.

51. Orexigen initiated the LIGHT Study in June 2012 and completed screening in December 2012, which resulted in approximately 8,900 patients randomized for treatment. The FDA previously agreed that ***if*** the LIGHT Study's interim analysis met the specified criteria to exclude cardiovascular risk, Contrave could be approved. Given its high cost and duration, however, Defendants did not support being required to conduct the LIGHT Study. The Company's 2014 Annual Report even described how the "conduct of the LIGHT Study has been, and will continue to be, a lengthy, expensive, complex and uncertain process requiring the expenditure of substantial resources.… The FDA has substantial discretion in the drug approval process, including the ability to delay, limit or deny approval of a product candidate for many reasons."

52. In November 2013, the LIGHT Study's DMC shared with Orexigen the completed interim results, which were supposed to be limited to those individuals at the Company who needed to facilitate its regulatory filings with the FDA. The same month, Orexigen announced successful results of the interim analysis of the first

LIGHT Study. A November 25, 2013 *Forbes* article called "Orexigen Obesity Drug Gets a Good Checkup. But Will It Sell?" reported that:

> A team of Orexigen employees must see the data in order to prepare a new drug application. But Steven Nissen, the Cleveland Clinic cardiologist who is running the trial, knows no more than was revealed to investors today.
>
> One person who does know: Narachi himself, ***who says he needs to know in order to make plans for his small company***. Usually, CEOs are not privy to these data. That makes him the man who knows too much. He has to be careful not to tell investors any more about the study results than has been revealed so far – no new information about how Contrave is performing on heart disease or any other safety issue. Curious investors could be his biggest regulatory threat.
>
> Narachi pledged to me that he would stick to this, saying that patients sign up for clinical trials not just for the chance to get an experimental drug but in order to advance science. '***We're going to honor the integrity of that blind*** so we don't screw it up and get the final analysis,' he says.

53. In November 2013, the LIGHT Study's statistical review team requested that Orexigen submit DMC meeting minutes corresponding to discussion of the November 2013 interim results, as well as the data access plan.[11] Included in

---

[11] The DAP is an agreement between the LIGHT Study's steering committee, DMC, and Orexigen that the Company agreed to as part of keeping LIGHT Study results confidential. According to Dr. Jenkins, "[o]nce the company received the interim analysis from the DMC, they had a data access plan that should have limited the number of people within the company who had access to just those who are needed to submit a marketing application to the FDA, ***not*** those involved in making

the minutes, however, was vague mention that "business interests do not provide a sufficient justification for gaining access to confidential information on efficacy and safety." Sufficiently concerned by that language, a LIGHT Study statistical review team requested that Orexigen produce a list of individuals who "had knowledge of the interim results or access to unblinded interim data."[12] They subsequently discovered that the Company had leaked positive interim data to over 100 people with a financial interest in the LIGHT Study.

54. The Company's leak was designed, in part, to improperly facilitate Orexigen's December 2013 offering of $100 million aggregate principal amount of convertible senior notes due 2020 in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933. Orexigen expected to raise approximately $96.1 million in net proceeds but, later that month, the offering was closed with net proceeds of $110.5 million in illicit funds raised.

55. Contrave was later approved for commercial use by the FDA in September 2014 but, due to the Company's earlier leak, and as part of the FDA approval process for Contrave, Orexigen and Takeda were required to conduct a new randomized, double-blind, placebo-controlled study to evaluate the effects of long-term treatment with Contrave on the incidence of MACE in overweight and obese patients with cardiovascular disease or multiple cardiovascular risk factors.

---

business or investment decisions." *Wall Street Journal*, "Orexigen Data Is 'Unreliable and Premature:' FDA's Jenkins Explains" (March 6, 2015).

[12] Center for Drug Evaluation and Research Summary Review: Application No. 200063Orig1s000 (September 10, 2014).

### 3. The FDA Condemns Orexigen's Leak of Interim LIGHT Study Data

56. On August 11, 2014, the FDA held a public hearing to address "Confidentiality of Interim Results in Cardiovascular Outcome Safety Trials" like the LIGHT Study. Senior FDA attendees included OND Director Dr. John Jenkins. Several Orexigen representatives and Dr. Nissen also attended the hearing in person. Thomas R. Fleming, a Professor of Biostatistics at the University of Washington and the head of the LIGHT Study's data and safety monitoring committee made a presentation at the August 11, 2014 hearing stating that the purpose of a DMC was to safeguard the interests of the study participants and to "preserve the trial integrity and credibility to enable the clinical trial to provide timely and reliable insights to the broader clinical community."

57. Dr. Fleming also added that there "is near ***unanimity*** that the interim data and the deliberations of the DMC should be ***absolutely*** confidential and breaches of confidentiality are to be treated ***extremely*** seriously." The Insider Defendants were each clearly aware of the August 11 hearing and its findings given that, during a November 10, 2014 earnings conference call with investors, Defendant Narachi acknowledged that the "August 11 hearing [ ] was around how best to use interim data and maintain confidentiality of interim data. . . ."

58. Despite the clear prohibition of the early release of interim data known or deliberately disregarded by Defendants, an FDA "Summary Review for Regulatory Action" report dated September 10, 2014 confirmed that, in late 2013, Orexigen had improperly disseminated unblinded interim data "***far beyond*** the intended core group." The same report described how the DMC "found that it [was] particularly concerning that members of Orexigen's Board of Directors (the "Board"), who have financial interest in the outcome of the trial, were also provided

***full access*** to unblinded data."[13] The DMC also noted that "others [who saw the data] include the Orexigen CEO [Defendant Narachi], ***investment bankers***, and several representatives from Takeda Pharmaceuticals (including Corporate Communications, Chief Commercial Officer, and Head of Global ***Marketing***)."

59. Dr. Janelle K. Charles, the LIGHT Study researcher responsible for statistical review for safety, harshly criticized Orexigen stating that it had "taken actions that have the potential to compromise the integrity of the LIGHT trial raising concerns about the ability to rely on data generated after ***the blind was broken***…."[14] The DMC concluded that "business interests do not provide a sufficient justification for gaining access to confidential information on efficacy or safety." During a June 4, 2014 meeting about Defendants' breach, the FDA reminded Defendants Narachi and Klassen that 25% interim results have "a high degree of uncertainty and were likely to change with the accumulation of additional data."

60. As a direct consequence of Orexigen's misconduct, the FDA required Orexigen to perform an entirely new trial to satisfy the requirement that it study Contrave's cardiovascular effects. The FDA, the trial executive committee and the DMC also required Orexigen to sign the fourteen-page confidentiality agreement forbidding the Company and its insiders from again breaching their confidentiality obligations. The Company signed the FDA Agreement and the parties agreed to

---

[13] As alleged in ¶¶76-86, *infra*, the Insider Defendants also leaked LIGHT Study data to the Board to influence the compensation committee's executive compensation awards.

[14] *C/f* ¶¶9, 52, *supra*.

continue with the LIGHT Study trial but, as one observer from the LIGHT Study DMC later remarked – "[t]hey just signed the agreement and ***promptly ignored it***."[15]

### 4. Defendants' Patent Scheme

61. At all relevant times, Defendants clearly knew and/or were deliberately reckless in not knowing that further confidentiality breaches could and likely would expose the Company to fines, Contrave's withdrawal from the market and/or the imposition of other regulatory sanctions by the FDA. Nevertheless, on July 2, 2014, Defendants Narachi and Klassen engaged in an undisclosed reckless scheme to leak the positive 25% interim data they knew they were prohibited from revealing *via* the 2014 Patent Application. Defendant Klassen was listed as the "patent applicant" and "inventor" in the Company's filing. Defendants concealed their confidentiality breach by filing the 2014 Patent Application pursuant to 35 U.S.C. §122 which provides that such applications are:

> [K]ept in confidence by the Patent and Trademark Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of an Act of Congress or in such special circumstances as may be determined by the Director.

62. After explicitly including specific 25% interim LIGHT Study data that Orexigen was required to keep secret, the 2014 Patent Application summarized, *inter alia*, that:

> ***Surprisingly***, rather than increasing the occurrence of MACE in this high risk patient population, the results indicate that treatment with

---

[15] *Forbes*, "Orexigen 'Crying All the Way to the Bank' After 'Egregiously Unethical' Actions" (March 5, 2015).

> [Contrave] ***decreases*** the occurrence of MACE in overweight and obese subjects with cardiovascular risk factors. Briefly stated, fewer subjects in the [Contrave] treatment group experienced a MACE event compared to placebo.[16]

63. Then, in December 2014, the Insider Defendants learned that the Committee for Medicinal Products for Human Use ("CHMP"), the centralized expert advisory committee of the European Medicines Agency ("EMA"), adopted a positive opinion [for Contrave] and recommended that the European Commission (the "EC") grant a centralized marketing authorization (the "CMA") through a binding EC decision.[17] That same month, the EC also informed Orexigen that a draft decision granting marketing authorization for Contrave would be reviewed during a meeting of the Standing Committee scheduled for March 2015.

64. After learning about the meeting, on January 5, 2015 the Company quickly requested that the USPTO ***publish*** the still then-secret 2014 Patent Application before European regulators met in March 2015. That day, Orexigen sent the USPTO a "Rescission of Previous Nonpublication Request" rescinding its July 2, 2014 request that the patent remain secret and the USPTO's response dated

---

[16] The current report on Form 8-K that Orexigen filed with the SEC on March 3, 2015 later mirrored this language, representing that the patent and patent application "contain claims related to a positive effect of Contrave on CV outcomes. The observed effects on CV outcomes were ***unexpected*** and appear to be unrelated to weight change."

[17] Contrave is marketed under the name Mysimba in Europe. For purposes of simplicity, the drug is referred to throughout herein as Contrave.

January 12, 2015 confirmed Orexigen's "rescission of the previously-filed nonpublication request."[18]

65. The Company then asked the USPTO to ***expedite*** publication of the patent application to increase the likelihood that the USPTO would publish the patent early enough to influence European regulators with the positive, but unreliable, 25% interim LIGHT Study data contained in the 2014 Patent Application. A European Medicines Agency summary report about Contrave dated March 2015 confirms that "***[i]nterim data*** from an ongoing study of cardiovascular outcomes ***were reviewed*** during the assessment [of the drug]."

66. The 2014 Patent Application also served another purpose. Namely, because Contrave is made from two off-patent generic drugs (bupropion and naltrexone) Defendants recklessly assumed that they had another indication for Contrave based on the 25% interim data – *i.e.*, a cardiovascular benefit. They therefore rushed to secure the patent with knowingly incomplete 25% interim LIGHT Study data, despite their obligations not to do so. Since both component drugs for Contrave are off-patent, the only new patents the Company could legitimately claim were based on new indications. Orexigen's patent filed in July 2014 did not and does not prohibit other companies from patenting the exact same two drugs for a different indication. In their haste to secure what appeared as an additional indication for Contrave and as a ruse to publicly disclose the seemingly positive 25% data, the Insider Defendants let their short-term executive compensation goals (*see* ¶¶70-86, *infra*) trample over scientific integrity and the FDA Agreement.

---

[18] At all relevant times, the Company's outside IP counsel was Knobbe, Martens, Olson & Bear, LLP.

67. On February 11, 2015, the USPTO advised Orexigen that the 2014 Patent Application would be published on March 3, 2015. On February 25, 2015, a month after Defendants had already rescinded their secrecy request with the USPTO, the Insider Defendants hosted a conference call for investors where Defendant Klassen misrepresented that "***there won't be any release of the*** [LIGHT Study] ***information*** unless pre-specified boundaries are hit."

68. Just two days later on February 27, 2015, the Company filed its 2014 Annual Report warning investors for the first time ever in one of its SEC filings that "[d]isclosure of interim results of ongoing clinical trials, including disclosure of interim results related to the protection of intellectual property, or delays in the commencement, the transfer and delivery of clinical trial information or completion of clinical trials could significantly affect our product development costs ***or adversely impact our ability to maintain or receive additional regulatory approvals***."

69. Defendants' cynical eleventh-hour warning, buried in the Company's filing and coming a full ***seven*** months after Defendants Klassen and Narachi improperly included 25% interim data in the 2014 Patent Application, was too-little-too-late for investors. The Class Period begins just ***two business days*** after the 2014 Annual Report was filed with Orexigen's improper March 3, 2015 disclosure of 25% interim LIGHT Study results *via* the 2014 Patent Application. Orexigen had previously announced new patents on the "news" portion of its website with almost no detailed information about the patents.[19] Indeed, biotechnology companies like

---

[19] On November 21, 2014, for instance, the Company disclosed U.S. Patent Application No. 11/757,773 without any accompanying Form 8-K that simply stated that the new patent "covers use of Orexigen's sustained release formulation of naltrexone, which was designed to improve drug tolerability for Contrave

Orexigen almost always obtain patents without filing any Form 8-K's or issuing any other form of public communication.

70. Had the Company genuinely intended, as Defendant Narachi represented on March 3, 2015 (*see* ¶94, *infra*), to protect the integrity of the clinical trial process and intellectual property rights, the Insider Defendants could and would have: (i) preserved their original request that the 2014 Patent Application remain unpublished; (ii) waited until the full LIGHT Study trial results became available; and (iii) only then released anything pertinent to cardiovascular risk or benefit from the LIGHT Study related to Contrave. On March 5, 2015, a *Forbes* article entitled "Orexigen 'Crying All the Way to the Bank' After 'Egregiously Unethical' Actions," described these developments, in relevant part, as follows:

> Armed with the positive findings of the interim analysis Orexigen's leaders decided that the preliminary finding of cardiovascular benefit was something for which the company could and should seek a patent. Because the two compounds that comprise Orexigen have been previously approved and are no longer on patent, Orexigen's intellectual property is based on the novel application of the drug combination to reduce weight. The new data adds the CV outcomes as a new indication, independent of weight loss.
>
> There is widespread speculation that ***Orexigen used the excuse of the patent filing to publicly reveal the interim results of the trial***. According to this view, Orexigen benefits from the highly positive findings, despite the fact that all the experts agree that these preliminary

---

(naltrexone HCl / bupropion HCl extended release), in a method for treating obesity. The patent is expected to expire in March of 2028."

results, based on only 94 events, are extremely unreliable and the positive effect will either disappear or diminish substantially as more events accrue. If confirmed, the 41% reduction in major adverse cardiovascular events would place Contrave among the most effective cardiovascular drugs of all time.

* * *

Disclosing the result, through the medium of a patent filing and an SEC disclosure, is a ***deeply cynical and manipulative action***, they believe. 'This is the most egregious ethical violation I've ever seen' in clinical trial conduct, said one source. In response to all the severe criticism they are 'crying all the way to the bank.'

The company signed an agreement that it wouldn't disclose the data to any persons outside of the small circle who were required to know for regulatory purposes. But this agreement turned out to be worthless when ***Orexigen leaders cynically ignored their commitment in favor of a quick buck***, say critics.

In its statement to the press Orexigen suggested that it had acted the way it did in order to meet 'its fiduciary duties to shareholders.' But it is precisely for this reason that company officials, including board members and other employees responsible for the business side of the company, should not have seen this data.

71. Defendant Narachi's representation that the Company had to file the March 3, 2015 Form 8-K as soon as Orexigen received the patent "to make sure this information was equally available to all investors" was a deceitful attempt to justify releasing the interim data through the ruse of protecting the Company's intellectual property and disclosure duties as alleged in ¶¶70 and 94, *infra*.

72. In a press release on Form 8-K on March 26, 2015, the Company announced that Contrave had received marketing authorization in Europe. In response to the news, shares of the Company's shares surged on massive volume of over 9 million shares that day from an opening price of $6.89 on March 26, 2015 to close at $7.54 on March 27, 2015.

73. A *Forbes* report later quoted none other than Dr. Nissen who described the Company's 2014 Patent Application contrivance as follows – "***[w]e work with industry with the expectation that there is not an effort to game the system*** … The [FDA Agreement] doesn't let them share it with business partners or with their own board,' Nissen says. 'Why would we allow them to publicly release it in a patent?'"

### 5. The Cleveland Clinic Terminates the LIGHT Study

74. On March 26, 2015, LIGHT Study researchers discovered that Contrave's purported 25% interim heart benefit vanished once additional 50% LIGHT Study results were considered. The LIGHT Study's ESC chaired by Dr. Nissen thereafter unanimously voted not only to stop the drug trial but to immediately release the accurate 50% interim data. The same day, Orexigen and the Insider Defendants were actually shown the more mature 50% data demonstrating that the cardiovascular benefit the Company had earlier touted on March 3, 2015 was false.

75. Dr. Nissen then started working with Orexigen's business partner, Takeda, to craft a simple press release disclosing the more mature 50% LIGHT Study data and the termination of the LIGHT Study. Takeda immediately approved Dr. Nissen's straightforward release but Orexigen inexplicably rejected it. The Insider Defendants' ostrich-like charade played on for six weeks until May 12, 2015 when Dr. Nissen forced Defendants to reveal the truth. Over the same time period, however, the Insider Defendants were personally enriched by the same Board they

had improperly leaked confidential 25% interim LIGHT Study data to before the Class Period.

### 6. The Insider Defendants Personally Benefitted from Their Misconduct

76. At all relevant times, the Individual Defendants' incentive-based executive compensation was directly tied to Contrave's approval in the United States and Europe. Defendants' public release of knowingly statistically-unreliable 25% interim results, and their suppression of the accurate 50% results (revealing that Contrave in fact had no beneficial impact on MACE), artificially inflated the value of Orexigen's securities. At all relevant times, the compensation committee of Orexigen's Board, who had learned of the 25% data by the Insider Defendants, aligned the Insider Defendants' compensation with "short-term and long-term performance." The Company's Proxy Statement on Schedule 14-A filed with the SEC on April 22, 2015 also represented that the Company's "board of directors established certain corporate goals underlying the cash bonus plan for fiscal year 2014 that our company and each individual executive would focus their efforts on achieving."

77. These goals were set on a 100-point scale to "fully [meet] expectations" with the potential to earn up to 125 points if company performance "exceed[ed] expectations." Each corporate goal made up a percentage of the total available 100 points. As alleged throughout herein, Defendants Narachi and Klassen improperly shared interim data to the Company's Board – including its compensation committee – to ensure that they and Defendant Hagan would personally benefit from the alleged misconduct.

78. The Company's corporate goals for Fiscal Year ("FY") 2014 were directly tied to whether the FDA approved Contrave for use in the United States, as well as the Company's progress towards approval of the drug for sale in Europe.

Primarily as a result of Defendants patent scheme, and reckless 25% leaks of LIGHT Study data, did Orexigen achieve 90% of its corporate objectives. The Company achieved 75 (out of a possible 80) total points specifically related to Contrave's approval and marketing in the United States and abroad, including, *inter alia*:

- 25 points (out of 25 possible points) were awarded for Contrave's approval in the United States;
- 15 points (out of 15 possible points) were awarded for Contrave's commercial launch in the United States;
- 15 points (out of 15 possible points) were awarded for obtaining a positive opinion from the CHMP of the EMA, for the marketing authorization application of Contrave in Europe; and
- 10 points (out of 15 possible points) were awarded for obtaining a centralized marketing authorization from the European Commission for the MAA ("Contrave Approval in Europe").

79. The Board then "took the achievement of these corporate and underlying individual objectives into consideration in deciding 2014 compensation for each named executive officer." Different standards applied to Defendant Narachi then to Defendants Hagan and Klassen. As CEO, Defendant Narachi's bonus was determined solely upon the achievement of corporate goals. Defendant Hagan's and Klassen's executive compensation was determined based on a blend of achieving corporate as well as individual goals. Corporate versus individual goals were at all relevant times weighted 60% and 40%, respectively. The individual goals were dependent on the approval and marketing of Contrave in the United States and Europe which would have never occurred but for the Insider Defendants' patent scheme and 25% interim data leaks.

**a) Magnitude of Personal Benefit**

80. As Orexigen's CEO, Defendant Narachi's performance was determined based entirely on the achievement of the Company's corporate goals. Having

purportedly achieved 90% of those goals (as a result of the patent scheme and his and Defendant Klassen's 25% interim LIGHT Study data leaks) the Board awarded him $432,422 in non-equity incentive plan compensation and equity options valued at $3,417,406 for FY 2014. Defendant Narachi received total compensation of $4,499,269, representing an overall increase of 27.6% over his compensation of $3,526,837 for FY 2013.

81. When compared to FY 2012, Defendant Narachi's total compensation for FY 2014 represented an overall increase of 54.9% as compared to his total compensation for FY 2012 of $2,905,044. He received options awards valued at $1,686,330. By his misconduct, which included leaking sensitive interim LIGHT Study data to the Board and investment banks, Defendant Narachi obtained a 102.7% increase in options awards in FY 2014 compared to FY 2012.

82. In addition to corporate goals, Defendant Hagan's individual goals emphasized developing Contrave for markets both at home and abroad. At all relevant times, he was to "[e]ffectively lead and manage the finance and accounting teams as Orexigen transitions into a commercial stage company" and "[l]ead the ROW [rest of the world] partnering process and make significant progress toward establishing partnership(s) to further develop and commercialize Contrave outside North America." According to the Board, Defendant Hagan purportedly satisfied 94% of his individual goals, was awarded $178,248 in non-equity incentive plan compensation and equity options valued at $1,141,672 for FY 2014.

83. Defendant Klassen's individual goals emphasized developing Contrave for markets both at home and abroad. Defendant Klassen was to "[l]ead efforts to obtain Contrave approval by the FDA," "[t]ransition administration of the LIGHT Study to Takeda," and "[d]efend marketing authorization application for Mysimba [Contrave] to achieve a positive opinion from the CHMP and approval from the

European Commission." According to the Board, Defendant Klassen purportedly satisfied 94% of his individual goals and was awarded $178,248 in non-equity incentive plan compensation for FY 2014. As a beneficiary of the fraudulent scheme alleged herein, he was awarded further equity options valued at $1,040,191 for FY 2014.

**b) Timing of Personal Benefit**

84. In early February 2015, the USPTO informed Defendants that the 2014 Patent Application would be published on March 3, 2015. By disclosing the 25% interim results that same day, just weeks before the European regulatory meeting about Contrave (*see* ¶¶63-64, *supra*), Defendants' improper 25% data leak would almost certainly win European regulatory marketing authorization on the eve of Contrave's consideration there. At the same time, on February 5, 2015, Company insiders received large, well-timed stock options grants: (i) Defendant Hagan was awarded options on 202,650 shares at an exercise price of $5.34; and (ii) Defendant Narachi was awarded stock options on 635,150 shares at an exercise price of $5.34. On March 3, 2015, the Company's share price soared 32% in a single day to close at $7.64, generating instant paper profits of approximately $2 million for Defendants Narachi and Klassen based on their improper leak.

85. Then, on March 13, 2015, the Company filed its 2015 Registration Statement that showered the Company's insiders with shares valued at over $42 million. As part of the offering, the 2015 Registration Statement incorporated by reference the Company's materially misleading March 3, 2015 Form 8-K. Six million shares of the Company's common stock, par value $0.001 per share, were registered at an artificially inflated price of $7.08 pursuant to Orexigen's 2007 Equity Incentive Award Plan.

86. The Insider Defendants were also already prepared to exercise

significant stock options within 60 days of March 31, 2015 – just four ***days*** after Contrave received European marketing authorization on March 26, 2015: (i) Defendant Narachi owned 53,980 shares of common stock, but ***4,716,448 shares*** of common stock were subject to options exercisable within 60 days of March 31, 2015; (ii) Defendant Hagan owned 8,980 shares of common stock, but ***1,273,344 shares*** of common stock were subject to options exercisable within 60 days of March 31, 2015; and (iii) Defendant Klassen owned 4,130 shares of common stock, but ***1,202,283 shares*** of common stock were subject to options exercisable within 60 days of March 31, 2015.

## B. Defendants' Materially False and Misleading Class Period Statements and Omissions

### 1. *Orexigen's Current Report on Form 8-K* (March 3, 2015)

87. The Class Period commences on March 3, 2015 with Orexigen's wrongful release of 25% interim results for the then ongoing LIGHT Study. The 25% interim results indicated that Contrave reduced cardiovascular events by 41% compared with a placebo. According to the Company's Form 8-K:

> The 371 Patent and the Provisional Patent Applications incorporate data from a pre-planned interim analysis of the large, randomized, placebo-controlled, cardiovascular ("CV") outcomes trial of Contrave® . . . , or the LIGHT Study. The 371 Patent, which expires in 2034, is the first in the LIGHT Study family of patent applications Orexigen has prosecuted and covers two subgroups of the larger LIGHT Study patient population. The Provisional Patent Applications are part of the same family of patent applications that were first filed in December 2013.

The 371 Patent and the Provisional Patent Applications contain claims related to a positive effect of Contrave on CV outcomes. The observed effects on CV outcomes were unexpected and appear to be unrelated to weight change.

* * *

The LIGHT Study randomized 8,910 obese patients with a primary endpoint of evaluating the impact of treatment on the combined incidence of myocardial infarction (heart attack), stroke and CV death in patients taking Contrave versus placebo. For regulatory approval purposes, the LIGHT Study, included a pre-planned interim analysis designed to exclude a doubling of CV risk compared to placebo (i.e., to rule out a hazard ratio of 2.0 using the upper bound of the 95% confidence interval). This analysis was conducted based on 94 observed and adjudicated major adverse cardiovascular events ("MACE"), which was approximately 25% of the planned MACE for the LIGHT Study (the "25% Interim Analysis"). The 25% Interim Analysis was prospectively designed to enable an early and preliminary assessment of safety to support regulatory approval. A larger number of MACE are required to precisely determine the effect of Contrave on CV outcomes.

88. After misleadingly describing specific 25% interim LIGHT Study data, the 8-K displayed a deceptive graph indicating a much lower incidence of cardiac events for participants receiving Contrave in the study than for those receiving the placebo:




89. The Company's statements and other representations had their intended effect as the price of Orexigen common stock soared from a March 2, 2015 close of $5.79 per share to trade as high as $9.37 per share in intraday trading on March 3, 2015, closing that day at $7.64 per share, on highly unusual trading volume of more than 95.8 million shares.

90. In a research note dated March 3, 2015, RBC Capital Markets analyst Simos Simeonidis responded to Defendants' disclosure, stating that "[w]e view the news as very significant.… The ***newly*** revealed data demonstrated that not only is Contrave safe to use from a CV standpoint, but it ***actually appears to have a CV benefit***." He rated the Company's shares to "outperform." Analysts at Piper Jaffray also issued a Company note on March 3, 2015 saying that the LIGHT Study interim

results that Orexigen disclosed in the 8-K "[c]ould turn the obesity/metabolic syndrome market ***on its head***. We see this CVOT effect as ***surprisingly positive*** and it has several implications, in our view for the potential of Contrave."

91. On March 3, 2015 Leerink analyst Paul Matteis similarly relayed Defendants' materially misleading representations noting that "25% Interim LIGHT Analysis Shows Stat. Sig [statistical significant] Contrave Benefit on CV Outcomes." His note added that, after meeting with Orexigen management, "the company unexpectedly disclosed the data from the 25% interim analysis of the LIGHT Contrave cardiovascular study.… The data this morning show a ***statistically significant*** Contrave benefit.…" On March 4, 2015, Wells Fargo analyst Matthew J. Andrews characterized the data as "the '***holy grail***' for treating cardiometabolic diseases is demonstration of a CV mortality benefit, which ***to date*** has not been demonstrated by an obesity therapeutic.…"

92. The statements in ¶¶87-88, *supra*, were materially false and misleading and/or failed to disclose that: (i) the 25% study results Defendants improperly released on March 3, 2015 showing that Contrave reduced the risk of heart attacks and cardiovascular death were "unreliable," "likely false," and "misleading;" (ii) Orexigen violated the FDA Agreement forbidding the Company from releasing LIGHT Study interim results; (iii) Orexigen knew, no later than July 2, 2014, that Defendant Klassen had included specific interim LIGHT Study data in the 2014 Patent Application; (iv) Orexigen had made a request with the USPTO in January 2015 to have the patent publicly disseminated; (v) Orexigen faced potential fines, civil penalties, and the possible removal of Contrave from the market by the FDA; and (vi) as a result of the above, the Company's Class Period filings with the SEC were materially false and misleading at all relevant times.

### 2. *Orexigen's Press Release* (March 3, 2015)

93. On March 3, 2015, *Forbes* reported that FDA senior official Dr. John Jenkins had stated, in pertinent part, that the FDA was unaware that Orexigen's 2014 Patent Application contained specific interim study data and expressed "serious concerns" about Orexigen's disclosure of the interim data. The FDA also stated that day that it had already "strongly urged Orexigen to protect the interim data from public disclosure and [that the agency was] very disappointed by Orexigen's actions." Stunned by the Company's intentional leak of interim LIGHT Study data, the FDA warned patients and physicians that it was "critical that the[] interim data [] not be misinterpreted."

94. In an effort to maintain the artificial price inflation in the Company's securities, immediately after Dr. Jenkins' quote was carried on *Forbes* on March 3, 2015, Orexigen publicly responded to the *Forbes* report (which had first reported on the FDA's comments on the disclosure of the interim trial data on March 3, 2015) stating, in pertinent part:

> Orexigen conducted a large cardiovascular outcomes trial in order to file for approval, with the study planned to continue after approval to serve a postmarketing regulatory requirement for additional risk exclusion. We observed an unexpected result in the interim analysis. We filed patent applications based on the results in order to preserve the potential for additional intellectual property. During the course of the study, the FDA informed us it had determined that the LIGHT Study would not serve as the postmarketing requirement for Contrave; a new trial would be required. At this point, the company decided to continue with the patent prosecution. The second

> cardiovascular outcomes trial is expected to start later this year, and we look forward to the results of that study which are anticipated by 2022.
>
> This morning ***the USPTO published the patent and supporting documentation***, and we believed it was appropriate and necessary to make sure this information was equally available to all investors.
>
> Orexigen has been working closely with, and is committed to continuing to work with FDA and others to support its regulatory obligations to thoroughly explore Contrave's therapeutic profile. Just as important, Orexigen is committed to its obligation to patients to fully explore the drug's profile.

95. The Company's representation that the USPTO had independently published the patent without the Company's input was highly misleading. In making the statement, Defendants failed to disclose that the USPTO only published what Orexigen itself needlessly put into the 2014 Patent Application. Defendants also failed to disclose that the Company had rescinded its earlier request that the 2014 Patent Application remain unpublished. In truth, the Company even paid the USPTO an extra fee to expedite publication of the 25% interim LIGHT Study data.

96. As reported by the *Wall Street Journal*, in an article published at approximately 11 a.m. on March 4, 2015:

> For the FDA, a basic principle is in play. The agency considers the preliminary data "***far too unreliable*** to conclude anything further about cardiovascular safety" and is concerned that premature disclosure of positive results can undermine the LIGHT study. Why? Participants may want to drop out of the trial if they believe they are taking a placebo. And the FDA believes Orexigen should know this.

"In order to protect the integrity of an ongoing trial, preserving confidentiality of the interim results is essential,["] the agency says in its statement. "The importance of maintaining confidentiality is well-articulated in International Conferences on Harmonization guidelines, FDA guidance, and the scientific literature."

But why had the agency already conveyed concerns about disclosure to the drug maker? This was not the first time that LIGHT study data was disclosed ***inappropriately***, according to the FDA. Prior to the Contrave approval last fall [2014], the agency learned that Orexigen had shared interim study results with "more individuals than FDA considered necessary to prepare a regulatory submission."

For this reason, the FDA last year decided that the LIGHT study should continue, but that Orexigen would have to launch a new study to satisfy the conditions of the approval of its Contrave drug. The LIGHT trial was designed to assess the extent to which the diet drug may increase the risk of a major cardiac event by 40% or more. Orexigen says this newly required trial will begin later this year.

Not surprisingly, the lead researcher for the study is upset. Steve Nissen, a cardiologist at the Cleveland Clinic, writes us that Orexigen had agreed to a "data access plan" with the trial's data monitoring committee that "strictly limited use of the data for a regulatory filing to FDA. ***Public disclosure*** of these incomplete data or use of data for business purposes was ***strictly forbidden*** by the [A]greement."

[Dr.] Nissen says he was not aware of the interim study results until yesterday, says the disclosure was ***not approved*** by the data monitoring committee or the trial's executive committee. And he notes

that Orexigen "business management" was not included in the list of individuals with approved access to the data.

97. As a result of the Company's materially misleading response to the FDA's March 3, 2015 admonition emphasizing that the interim data disclosure, while not expressly condoned by the FDA, was important and material information that the investment community should recognize, the price of Orexigen stock closed up further on March 4, 2015 at $8.49 per share, again on unusually high trading volume of more than 40.5 million shares, as the market continued to digest the positive news about the interim results.

98. The statements in ¶¶94-95, *supra* were materially false and misleading and were known or deliberately disregarded as such for the same reasons set forth in ¶92, *supra*.

99. On March 26, 2015, the Company announced in a Form 8-K that Contrave had received marketing authorization in Europe which maintained the artificial inflation in the Company's stock price as alleged in ¶72, *supra*. The same day, and unbeknownst to investors, Defendants were specifically told that the LIGHT Study had been halted and that the 50% interim LIGHT Study results showed no heart benefit. Nevertheless, on April 6, 2015, after personally meeting with Defendants Narachi and Hagan, Leerink analyst Paul Matteis relayed a highly positive report about the 25% interim results based Defendants' representations that "interim LIGHT data could meaningfully increase Contrave prescribing as they provided most survey respondents comfort that the ***Contrave is, at worst, CV safe or, at best, cardioprotective***…."

**3. *Orexigen's Current Report on Form 8-K* (May 8, 2015)**

100. On May 8, 2015, Orexigen filed its press release on Form 8-K with the SEC announcing its business and financial results for the first quarter ended March 31, 2015. The press release stated, *inter alia*, that:

> Four 56-week multicenter, double-blind, placebo-controlled Phase 3 clinical trials were conducted to evaluate the effect of Contrave in conjunction with lifestyle modification in 4,536 subjects randomized to Contrave or placebo. In these studies, the most common adverse reactions (>5 percent) seen in patients taking Contrave included nausea, constipation, headache, vomiting, dizziness, insomnia, dry mouth, and diarrhea.
>
> ***The clinical trial program also includes a double-blind, placebo-controlled cardiovascular outcomes trial known as the LIGHT Study***.

101. While discussing Contrave's business and financial results, prospects and suggesting that the LIGHT Study was ongoing in this manner, the Form 8-K failed to disclose that the LIGHT Study had been terminated weeks earlier on March 26, 2015 and that the 50% interim data demonstrated that the Company's prior representations about Contrave's purported cardiovascular benefit were false.

102. The statements and material omissions in ¶¶100-101, *supra* were materially false and misleading and/or failed to disclose that: (i) the 25% study results Defendants improperly released on March 3, 2015 showing that Contrave reduced the risk of heart attacks and cardiovascular death, were "unreliable," "likely false" and "misleading;" (ii) Orexigen violated the FDA Agreement forbidding it from releasing LIGHT Study interim results; (iii) Orexigen knew no later than July 2, 2014 that it had relied on specific interim LIGHT Study data in the 2014 Patent

Application; (iv) Orexigen had made a request with the USPTO in January 2015 to have the patent publicly disseminated; (v) all of the Defendants knew or were deliberately reckless in not knowing no later than March 26, 2015 that the LIGHT Study had been terminated and that the 50% interim data showed no heart benefit; (vi) Orexigen faced potential fines, civil penalties, and the possible removal of Contrave from the market by the FDA; and (vii) as a result of the above, the Company's filings with the SEC were materially false and misleading at all relevant times.

**4. *Orexigen's Quarterly Report on Form 10-Q* (May 8, 2015)**

103. On May 8, 2015, the Company filed its Quarterly Report for 1Q 2015 with the SEC on Form 10-Q. The 1Q 2015 10-Q failed to disclose that the LIGHT Study had been terminated and that the 50% interim data demonstrated that the 25% data Defendants had released on March 3, 2015 was false.

104. Specifically, the Company represented that the Company's share price ***might*** be impacted by "announcements regarding our clinical trials, including [ ] the LIGHT Study and the post-marketing required clinical trials, including the new CVOT, for Contrave" without disclosing that the LIGHT Study had already been terminated on March 26, 2015. The Company also misleadingly represented that "additional analysis of the interim results or new data from the ***continuing*** LIGHT Study, including safety-related data, and the additional cardiovascular outcomes trial, ***may*** produce negative or inconclusive results, or ***may*** be inconsistent with the conclusion that the interim analysis was successful," without disclosing that the Company knew that more mature 50% interim data had already demonstrated that Contrave did not produce any heart benefit as the Company had earlier represented.

105. In addition, the Company's 1Q 2015 10-Q misrepresented that:

> Future development expenses will depend on the ***timing of the LIGHT Study***, the new CV outcomes trial and any other additional clinical trials for Contrave, ***if any***, our financial resources and ongoing assessments as to Contrave's commercial potential. Clinical development timelines, the probability of success and development costs can differ materially from expectations. The lengthy process of completing our clinical trials, ***including the LIGHT Study***, and seeking regulatory approval for our product candidates requires the expenditure of substantial resources. ***Any failure by us*** or delay in completing our clinical trials, ***including the LIGHT Study***, or in obtaining regulatory approvals, ***could*** cause a delay in the commencement of product revenues and cause our research and development expenses to increase and, in turn, have a material adverse effect on our results of operations.

106. The statements in ¶¶103-105, *supra* were materially false and misleading and were known or deliberately disregarded as such for the same reasons set forth in ¶102, *supra*.

**5. *Orexigen's 1Q 2015 Earnings Conference Call* (May 8, 2015)**

107. On May 8, 2015, the Company hosted its 1Q 2015 earnings conference call for analysts and investors. At the beginning of the call, Defendant Narachi revealed that the Company's Chief Commercial Officer, Mark Booth, was "leaving Orexigen." RBC Capital Markets analyst Simos Simeonidis asked why "one of the key players" on commercializing Contrave after its FDA approval in fall 2014 was "leaving." Defendant Narachi responded that Mr. Booth purportedly wanted to "focus on opportunities closer to home."[20] Mr. Booth's role, prior to his departure,

---

[20] As an executive member of the Company's Senior Management team, Orexigen was required to file a Form 8-K disclosing Mr. Booth's departure under

was to "[a]chieve or exceed Contrave commercial launch goals consistent with the expectations of Orexigen and Takeda," and to "[d]rive progress on the Contrave Life Cycle Management Plan with Takeda. Further, Mr. Booth was to develop and communicate both "the commercial investor relations story pre/post launch" and "the commercial plan to drive progress on ROW partnership." The timing of Mr. Booth's departure, particularly given his function at the Company so soon after Contrave was approved in the U.S. and Europe, was suspicious.

108. During the same call, Merrill Lynch analyst Steve Byrne then specifically asked: "what is the fate of the LIGHT Study at this point. Has that been terminated?" In response, Defendant Klassen knowingly and/or with deliberate recklessness represented that the "***LIGHT Study is continuing*** and we are continuing to engage both Orexigen and Takeda with the FDA and with ESC and DMC regarding ultimately the status of the study, but ***it's an ongoing entity as of right now***."

109. RBC Capital Markets analyst Simos Simeonidis then asked a targeted question about the Company's quantitative LIGHT Study interim data results, asking whether: "the 50% interim look happened? Have events occurred yet?" Unwilling to answer the questions himself, Defendant Narachi punted, asking whether "[Defendant] Preston…want[ed] to take that?" Defendant Klassen of course was then forced to try to respond that: "[w]e have passed the 50% time point and as we've stated before, those results are viewed by the Data Monitoring Committee and it

Item 5.02 of Form 8-K. Instead, on March 30, 2015, the Company issued a press release announcing that it had hired Tom Cannell as Chief Commercial Officer. Buried at the very bottom of that press release, Orexigen noted that "Mark Booth, who has served as Chief Commercial Officer since 2009, will leave Orexigen later this year."

wasn't a planned look by the sponsors, like the 25% was. The 25% was special because it was for regulatory purposes and so we have had 50% time point." Defendant Klassen failed to disclose that the 50% interim data he had seen weeks earlier showed that the 25% data was false.

110. Analyst Simeonidis then pressed the 50% data issue, asking: "I assume you're not going to be releasing that; are you going to be sending it to the FDA?" Defendant Klassen responded that: "[s]o we're in ongoing discussions related to that and I don't think ***we're going to go into the details***, because again that's a look that DNC does. As a plan, they look at the 25% to 50% and 75%, but it's really on the 25% analysis that was used for regulatory purposes. So ***if*** any of that status changes, then we would of course announce that." Defendant Narachi then interrupted, saying:

> Yes. Steve, I think that 50% interim was always designed as an administrative look only unless of course the trial stuff for either superiority or harm, then results would come out. The results from the 50% analysis, I think the way to think about it is, those only come out in the context of wrapping up the trial or as a final analysis. So, ***if the decision is made to terminate the trial early*** and focus resources on the next CVOT, which is what we have been advocating, then I think results would come out sooner perhaps that would either be the 50% of the final results in that, there's quite a few events between the 50% analysis, for example, ***if you decide to stop the study now*** there will be additional events, so these details are being discussed and worked out and as we make formal decisions there, you'll learn more about the availability of data from the study.

111. Still honing in on the LIGHT Study data issue, analyst Charles Duncan of Piper Jaffray insisted on asking:

> [O]ne final obligatory LIGHT Study question … I'm wondering if you could provide an estimate of the time or the strategy for disclosure around the fate of the LIGHT Study – ***is that something that you need to disclose*** or is there a timing that you would estimate when you would disclose what's going on with the LIGHT Study or would that just be seen on some public website like I think it's clinic trials?

Defendant Narachi, who had been informed weeks earlier by Dr. Nissen that the LIGHT Study had been halted, misleadingly responded that:

> ***I think that that would be something we disclose***. As [Defendant] Preston said, there are active discussions between FDA, the executive steering committee and DMC as a study Takeda and Orexigen. And as soon as we understand specifically what the status is, so for example, ***if there was a decision to terminate the trial*** and move on and focus resources on the new CVOT, ***that would be a disclosure that we would make***.

112. The statements in ¶¶108-111, *supra* were materially false and misleading and were known or deliberately disregarded as such for the same reasons set forth in ¶102, *supra*.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

113. When Orexigen's and the Insider Defendants' prior material misrepresentations and misconduct were revealed and became apparent to investors, the price of Orexigen securities declined precipitously – as the prior artificial inflation in the price of Orexigen's securities was eliminated. As a result of his purchase of Orexigen securities during the Class Period, Plaintiff and other members

of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

114. The economic loss suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Orexigen's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements and other fraudulent conduct were revealed. The timing and magnitude of Orexigen's securities price declines negate any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

115. At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Orexigen's business, prospects and operations.

116. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Orexigen and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiffs and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### A. The March 5, 2015 Disclosure Events Corrected Defendants' Materially False and Misleading March 3, 2015 Statements and Omissions

117. As a result of the Company's March 3, 2015 misrepresentation that the LIGHT Study showed Contrave provided heart health benefits, the price of Orexigen common stock skyrocketed from its March 2, 2015 close of $5.79 per share to trade as high as $9.37 per share in intraday trading on March 3, 2015, closing that day at $7.64 per share on highly unusual trading volume of more than 95.7 million shares.

118. Later in the day on March 3, 2015, the FDA issued an admonishment regarding the Company's disclosures in a *Forbes* report, stating, in pertinent part, that the agency was not aware that the 2014 Patent Application contained specific interim study data and expressing "serious concerns" about Orexigen's disclosure of the interim data. The FDA noted that the interim analysis was performed after the 9,000-patient trial had achieved only 25% of its primary endpoint events (MACE). This analysis contained only 94 events: 59 in the placebo group and 35 in the Contrave group. Endpoints with fewer than 100 total events are statistically unreliable and were to be viewed with extreme caution. The FDA also stated that it had already "strongly urged Orexigen to protect the interim data from public disclosure and [that the agency was] very disappointed by Orexigen's actions."

119. Orexigen released a responsive statement on March 3, 2015 stating, in pertinent part, that it had filed the patent application "based on the [interim] results in order to preserve the potential for additional intellectual property," and that the Company "believed it was appropriate and necessary to make sure this information was equally available to all investors." While the Company claimed to be willing to work with the FDA to meet its "regulatory obligations," Orexigen stated that it was "committed to simultaneously meeting its obligations to other regulatory authorities in the U.S., such as the SEC, and abroad, such as the [EMA], which [it said were]

relevant to, and ha[d] authority over, its business," emphasizing that the "company [was] similarly committed to meeting its fiduciary duties to shareholders."

120. Due to the Company's response to the FDA's admonition on March 3, 2015 emphasizing that the interim data disclosure, while not expressly condoned by the FDA, was important and material information the investment community should take heed of, the price of Orexigen stock closed higher on March 4, 2015 at $8.49 per share, again on unusually high trading volume of more than 40.5 million shares, as the market continued to digest the positive news about the interim results.

121. In the early afternoon of March 5, 2015, *Forbes* published a report quoting various stock analysts and drug development experts speculating that the Company's repeated early disclosure of interim LIGHT Study data could potentially threaten its relationship with the FDA and its ability to obtain further drug approvals with the agency. On this speculation, then uncorroborated by anybody at the FDA, the price of Orexigen stock began declining in the afternoon of March 5, 2015, closing just above $8 per share, down from its opening price of $8.50 per share.

122. After the close of trading on March 5, 2015, in a report entitled "Top FDA Official Says Orexigen Study Result 'Unreliable,' 'Misleading'" published on *Forbes.com*, top FDA official Dr. John Jenkins criticized Orexigen and its decision to release interim trial data. In the report, he criticized the released data as "unreliable," "misleading," and "likely false." Dr. Jenkins also said that the results must be kept confidential to avoid compromising the trial's integrity so researchers can get a clear sense of any cardiovascular risk that comes with the drug. The report also warned that if "Orexigen cannot find a way to set things right, it could face fines, civil penalties, or even the withdrawal of Contrave from the market."

123. As a result of the FDA's March 5, 2015 statements challenging the legitimacy and continuation of the Company's entire Contrave drug development

program, the price of Orexigen stock plummeted, dropping below $7 per share in intraday trading and closing just above $7 per share on March 6, 2015, again on unusually high trading volume. Shares of Orexigen's common stock fell as much as $1.25, or almost 16%, to as low as $6.76 in intraday trading on March 6, 2015. This decrease in Orexigen's stock price was a result of the artificial inflation caused by Defendants' misleading statements on March 3, 2015 coming out of the stock price.

124. In the same article, Dr. Jenkins added that the "paradigm has always been that the interim analysis data must be kept very confidential so that it doesn't become available for business purposes within the company." He added that when looks at a sample of only 25% of the data, any estimates regarding the treatment effect of the drug are highly unreliable and can lead to false conclusions about either the safety or the efficacy of the drug. He later stated that "Congress passed a law in 2007, FDAAA … ***They gave us the authority to require these trials***. If companies are not meeting their obligations there are ***fines, there are civil money penalties, there's a possibility for seizure, and there's even a possibility for initiating withdrawal procedures***."

125. The stock closed at $7.10 per share on March 6, 2015, down $2.27 per share from its intraday Class Period high on March 3, 2015, erasing more than $280 million in market capitalization.

### B. The May 12, 2015 Disclosure Events Corrected Defendants' Materially False and Misleading March 3, 2015 and May 8, 2015 Statements and Omissions[21]

126. On the morning of May 12, 2015, Dr. Nissen and the Cleveland Clinic issued a press release disclosing for the first time new information about Defendants' March 3, 2015 and May 8, 2015 materially false and misleading statements and omissions. Dr. Nissen and the Cleveland Clinic revealed, *inter alia*, that:

> Following premature disclosure of interim study results, the 9,000-patient LIGHT Trial – designed to study the cardiovascular safety of the obesity drug Contrave (bupropion-naltrexone) – ***has been halted*** by the trial's executive steering committee, led by Cleveland Clinic. The discontinuation of the study was announced earlier today

---

[21] On September 23, 2019, the Court entered an order granting in part and denying in part Defendants' renewed motion to dismiss (the "Order"). ECF No. 110. The Order found that loss causation was adequately pled for Defendants' materially false and misleading March 3, 2015 statements and omissions and that "… Dr. Nissen's May 12, 2015 press release may have served as a corrective disclosure for the alleged misrepresentations made on May 8, 2015 …" but that "the Court makes no determination as to whether the May 12, 2015 press release served as a corrective disclosure as to the alleged misrepresentations from May 8, 2015." ECF No. 110 at 37, n.7

While Defendants' renewed motion to dismiss did not challenge (and thus conceded) Plaintiff's loss causation allegations related to the May 8, 2015 material misstatements and omissions, Plaintiff nevertheless herein further refines its loss causation allegations related to Defendants' March 3, 2015 and May 8, 2015 material misstatements and omissions which were disclosed to the market on May 12, 2015. *See* ECF No. 98-1 at 19-20 (only challenging loss causation with respect to March 3 statements); ECF No. 103 at 22 (noting that Defendants conceded loss causation as adequately pled with respect to May 8 statements); ECF No. 105 at 7 (only challenging loss causation with respect to March 3 statements).

by Orexigen Therapeutics Inc. and Takeda Pharmaceuticals, the drug's developers.

The LIGHT Study was designed to meet the U.S. Food and Drug Administration's requirement for Orexigen to assess the cardiovascular safety of Contrave in overweight and obese patients, who are at a high risk of cardiovascular events due to diabetes and other health factors.

* * *

Orexigen was permitted to file for approval of Contrave with a pre-specified interim analysis after approximately 25 percent of MACE had occurred in the LIGHT Study, if the results ruled out a doubling of cardiovascular risk for patients taking Contrave. The results of this interim analysis, which were intended to remain confidential, demonstrated that Contrave met this criterion, and the FDA approved Contrave on September 10, 2014.

At the time of approval of Contrave, the FDA determined that Orexigen had violated the terms of a data access agreement by revealing the 25 percent interim results to both a wide group of individuals within the company and external business partners. The FDA also stated that this breach of confidentiality had sufficiently undermined its confidence in the ongoing trial; and a new trial would be required to determine whether a 40 percent increase in cardiovascular risk could be ruled out.

Subsequently, in March 2015, Orexigen publicly disclosed the confidential 25 percent interim analysis of the LIGHT Study as part of a patent and securities filing, ***without the authorization of the study's academic leadership***. At the time of this disclosure, the study's

executive steering committee strongly cautioned against any potential misinterpretation of the preliminary 25 percent interim data inappropriately released in this disclosure by Orexigen. As a large number of MACE events are necessary to determine effect in a cardiovascular outcome trial, the 25 percent interim data are not conclusive in establishing either benefit or risk of Contrave on cardiovascular risk.

* * *

"***These results do not confirm cardiovascular benefits of Contrave claimed by Orexigen in the patent application*** based on the data obtained at the 25 percent time point in the trial," said Steven Nissen, MD, chair of the study's executive steering committee and chair of cardiovascular medicine at Cleveland Clinic. "These results show neither benefit nor harm for patients taking the drug, but are consistent with the requirement by the FDA that the LIGHT Trial demonstrate an absence of a doubling of cardiovascular risk for patients taking the drug," Dr. Nissen added. "The inconsistency of effects on cardiovascular outcomes between the first 25 percent and the second 25 percent of the LIGHT Study clearly illustrates the risks inherent in pre-judgment of clinical trial results based upon an interim analysis and ***demonstrate why interim results should remain confidential during any ongoing trial***."

127. Dr. Nissen's press release referenced above in ¶¶ 126, *supra*, revealed the truth regarding Defendants' May 8, 2015 materially misleading statements and omissions concerning: (i) the true status of the LIGHT Study, which Defendants knew had been terminated as of March 26, 2015, but that they falsely stated to

investors on May 8, 2015 was "ongoing" and "continuing"; and (ii) the truth concerning the fact that the 50% LIGHT Study data demonstrated no Contrave heart benefit – which Defendants knew as of March 26, 2015, but failed to disclose on May 8, 2015. Dr. Nissen's May 12, 2015 press release therefore disclosed to the market for the first time the truth about the termination of the LIGHT Study and negative 50% data which Defendants had concealed and/or obscured by their fraudulent statements and omissions on May 8, 2015 despite having been told these material facts on March 26, 2015.

128. Later the same day on May 12, 2015, investigative reporter Matthew Herper ran a story on *Forbes.com* called "A Top Cardiologist Says a Diet Drug Maker Misled Patients and Investors" that described how:

> The supposed [heart] benefit [from Contrave] almost disappeared as time passed. As the number of heart attacks, strokes, and cardiovascular deaths increased from 94 to 192, the 41% difference between those getting Contrave and those getting placebo shrank to just 12% and was no longer statistically significant.
>
> * * *
>
> "***Patients were misled, investors were misled***," says Nissen. "It is so critically important that investors and other people understand why early data in a trial are unreliable or unstable."
>
> ***Worse, Orexigen has sought to block the release of the new data***. On March 26, [2015] the study's executive committee voted unanimously that the study should be stopped and the data publicized. ***But for six weeks Orexigen repeatedly refused to approve a press release, Nissen says***. Today, Orexigen and its marketing partner, Takeda, issued a release saying only that the study was stopped. The

Cleveland Clinic's release, unauthorized by the companies and filled with data, followed minutes later.

* * *

The trial was designed to prove that Contrave caused no more than a 40% increase in heart attacks, strokes, and cardiovascular deaths (euphemistically called "cardiovascular events" by doctors). It was expected to take until 2017.

But the FDA allowed Contrave onto the market sooner, using a regulatory mechanism that had originally been proposed by Nissen himself. Orexigen could peek at the data 25% of the way through and use that data to file with the FDA if it showed that Contrave was doing no worse than doubling the risk of a cardiovascular event. The deal, however, came with strings.

Nissen says that four Orexigen executives signed a 14-page document that said that the company would take extreme steps to make sure that only a carefully selected regulatory SWAT team would see the results. Specific areas of the company's offices would be locked up to keep the results secret, and the team would not use Orexigen's corporate email system to share them.

***Something very different happened***. According to FDA documents, more than 100 people saw the results, including top Orexigen officials, outside consultants, and lawyers. And, in a complete surprise, the results actually seemed to show that Contrave prevented cardiovascular events. The FDA chastised the company for allowing the data to leak, and said that the study could no longer be used to satisfy

Orexigen's regulatory requirement – the company would have to do a second study at an estimated cost of more than $100 million.

Instead of keeping the information quiet, Orexigen executives decided that they had a fiduciary duty to file for a patent based on the information. Nissen found out about the patent from Takeda executives, who had taken over the day-to-day management of the clinical trial from Orexigen. "I was livid," he says. "I almost couldn't believe it."

When the patent was approved on March 3, Orexigen filed a document with the Securities and Exchange Commission that included the total number of cardiovascular events, and the preliminary estimate on the reduction in risk to patients. The company's shares spiked 30%.

* * *

But in this case, probably because of the play of random chance, something different happened. In patients who stayed on Contrave or the placebo, there was a 30% reduction in the risk of heart attacks, strokes, or cardiovascular deaths. But in those who stopped taking the drug, the benefit was a much greater 53%. In other words, the results were better if patients were assigned to take Contrave, but then didn't! The differences were dramatic. In the off-treatment group, there were 12 cardiovascular deaths in the placebo group and 1 in the Contrave group.

* * *

Nissen and the FDA's Jenkins warned that the result was probably spurious. "Step back and think for a second," Jenkins told me then. "We required this study because we're concerned that Contrave may cause adverse cardiovascular events because of its effect on blood

pressure and heart rate. ***So the likelihood that that drug is going to have an early benefit is highly unlikely***."

The FDA initially worried that the results of the study had leaked to 100 people, and decided not to accept it. But now they had been released to the entire world. Nissen says he had hoped to continue to the end of the trial anyway, but that his executive committee faced another problem: patients were having fewer heart attacks and strokes than expected. In order for the trial to complete, doctors would have to enroll another 5,000 patients. It was futile.

***The executive committee voted unanimously to recommend that the trial be stopped and that the data through to the halfway mark be released immediately. They told Orexigen, and were shown the more mature data.*** Not only did the cardiovascular benefit seem to vanish, but there was a difference in deaths from other causes: 26 deaths on Contrave versus 17 on placebo. The difference was not statistically significant.

Nissen started working with Takeda to craft a simple press release that would contain the more mature data. ***Each time Takeda would approve the release Orexigen would reject it. The process went on for six weeks, and even continued as Orexigen conducted an earnings call during which executives said that no decision about the study had been made***.

Finally, he decided that the Cleveland Clinic would simply issue its own release, without the companies' approval, after it was announced that the trial had stopped. This morning, that happened.

129. The *Forbes.com* article referenced in ¶128, *supra* similarly revealed the truth regarding Defendants' May 8, 2015 materially misleading statements and omissions related to the status of the LIGHT Study and the truth about the 50% LIGHT Study data as alleged in ¶127, *supra*. In addition, Dr. Nissen's statement that "[p]atients were misled, investors were misled" in the May 12, 2015 *Forbes.com* article was the first time Defendants were accused of misleading investors on May 8, 2015.

130. A May 12, 2015 article published on *Medscape.com* titled "LIGHT Stopped: Contrave CVD Safety Study Halted Following Premature Release of Data," quoted Dr. Nissen on the use of the 2014 Patent Application as a ruse to release the 25% data as stating:

> Essentially, when they [Orexigen] filed the patent the company chose what they were going to put in there and what they were going to leave out … Frankly, the executives in the company never should have had access to the data. We felt it was in the public interest to take an unprecedented step and release the 50% data because we couldn't allow unreliable data to be used in clinical decision making. We had a duty to the public and also to the investment community, to tell the truth.

131. On May 12, 2015, it was also disclosed for the first time in a *Bloomberg* article, called "Takeda Threatens to End Orexigen Partnership as Study Halted," that Takeda – Orexigen's commercialization partner for Contrave – had initiated dispute resolution proceedings against Orexigen demanding it pay the full cost – estimated at $200 million – of a new cardiovascular outcomes trial due to Orexigen's materially misleading March 3, 2015 statements and omissions regarding Contrave's purported heart benefit. In a May 12, 2015 email to *Bloomberg*, Takeda spokesperson Sandy Rodriguez stated that "Takeda sent a dispute letter to Orexigen on May 12 whereby

Takeda seeks termination of its collaboration agreement with Orexigen based on Orexigen's material breach of the agreement …" A May 13, 2015 article appearing in the *Wall Street Journal* titled "Orexigen and Takeda Feud Over Cost of a Controversial Diet Drug Trial" confirmed, *inter alia*, that: "[t]he ***disclosure is causing Orexigen shares to drop***, since the cost of the trial is estimated to be about $200 million, according to RBC Capital Markets analyst Simos Simeonidis, who calculates that Orexigen would be on the hook for as much as an extra $100 million if it loses the dispute." Similarly, a May 13, 2015 article appearing in *Biospace.com* added that "the company stock took a big hit, dropping from a high of $6.93 per share on May 12, the day the partnership [with Takeda] was terminated, to today's low [on May 13, 2015] of $5.48 per share."

132. As a direct result of the May 12, 2015 disclosures alleged in ¶¶126, 128, 131, *supra*, which disclosed the truth for the first time regarding: (i) the status of the LIGHT Study (which corrected Defendants' materially false assertions that it was "ongoing" and "continuing" on May 8, 2015); (ii) the 50% data (which Defendants knew but failed to disclose on May 8, 2015 did not provide a heart benefit); and (iii) Takeda's initiation of a $200 million action against Defendants (which revealed for the first time that Defendants had failed to disclose that they had filed the March 3, 2015 Form 8-K revealing the dubious 25% heart benefit data without first informing Takeda as alleged in ¶¶15-17, 87-89, *supra*) the price of Orexigen's common stock fell from an opening price on May 11, 2015 of $6.75 per share to close on May 13, 2015 at $5.02 per share on massive trading volume as investors digested the full impact of Defendants' materially misleading statements and deliberately reckless acts. Together, the revelations and disclosures alleged in ¶¶126, 128, 131, *supra* caused the Company's share price to drop approximately 25% in a single day between May 12 and May 13, 2015 on unusually high trading volume.

133. The timing and magnitude of Orexigen's common stock price declines between May 12 and May 13, 2015 negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct. The Company's share price dropped from a high of $6.93 per share on May 12, 2015 to a low of $5.48 per share on May 13, 2015 – a sharp decline of approximately 25%. The Company's share price never recovered and Orexigen was thereafter delisted from NASDAQ. Chapter 11 bankruptcy later ensued.

## VII. APPLICABILITY OF PRESUMPTION OF RELIANCE

134. At all relevant times, the market for Orexigen's securities was an efficient market for the following reasons, among others:

(a) Orexigen common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Orexigen filed periodic reports with the SEC and the NASDAQ;

(c) Orexigen regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Orexigen was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

135. As a result of the foregoing, the market for Orexigen's securities promptly digested current information regarding Orexigen from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Orexigen's securities during the Class Period suffered similar injury through their purchase of Orexigen's securities at artificially inflated prices, and the *Basic* presumption of reliance applies.

136. Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose material facts, *inter alia*, regarding the LIGHT Study and the patent scheme, information which Plaintiff would have wanted to know and would have caused investors to avoid purchasing shares of Orexigen common stock at the prices they traded at during the Class Period.

## VIII. NO SAFE HARBOR

137. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

138. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Orexigen who knew that those statements were false when made.

## IX. CLASS ACTION ALLEGATIONS

139. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Orexigen publicly-traded securities during the Class Period.

140. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 1, 2015, Orexigen had over 125 million shares of its common stock outstanding, owned by hundreds if not thousands of persons.

141. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether Defendants violated the federal securities laws;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the prices of Orexigen publicly traded securities were artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

142. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

143. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

144. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X. CLAIMS FOR RELIEF

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants

145. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146. During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material

information about the business, operations and future prospects of Orexigen as specified herein.

148. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Orexigen's true financial condition from the investing public and supporting the artificially inflated price of Orexigen's securities.

149. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orexigen publicly-traded securities. Plaintiff and the Class would not have purchased Orexigen publicly-traded securities at the prices they paid, or at all, had they been aware that the market prices for Orexigen's securities had been artificially inflated by Orexigen and the Insider Defendants' materially false and misleading statements.

**COUNT II**

**For Violations of §10(b) of the Exchange Act and Rules 10b-5(a) & (c) Against All Defendants**

150. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

151. During the Class Period, Orexigen and the Insider Defendants violated SEC Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Orexigen publicly traded common stock during the Class Period as alleged herein. Orexigen's and the Insider Defendants' misconduct is distinct from the materially misleading statements pertaining to Count I.

152. During the Class Period, Orexigen and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153. They violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Individually and together, Orexigen and the Insider Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Orexigen related to the steps and acts Defendants took to conceal and then publish the interim LIGHT Study data *via* the 2014 Patent Application.

154. Orexigen and the Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Their misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Orexigen's misconduct from the investing public and supporting the artificially inflated price of Orexigen's securities.

155. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orexigen publicly-traded securities. Plaintiff and the Class would not have purchased Orexigen's publicly-traded securities at the prices they paid, or at all, had they been aware that

the market prices for Orexigen's securities had been artificially inflated by Orexigen's and the Insider Defendants' materially false and misleading statements and conduct

**COUNT III**
**For Violations of § 20(a) of the Exchange Act**
**Against the Insider Defendants**

156. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157. During the Class Period, the Insider Defendants acted as controlling persons of Orexigen within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

158. By reason of such conduct, Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 17, 2019

Respectfully submitted,

KAHN SWICK & FOTI, LLP

By: s/ *Ramzi Abadou*

Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
912 Cole Street, # 251
San Francisco, CA 94117
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

-and-

KAHN SWICK & FOTI, LLC
Lewis S. Kahn (*pro hac* to be filed)
lewis.kahn@ksfcounsel.com
Alexander Burns
(admitted *pro hac vice*)
Alexander.burns@ksfcounsel.com
Alayne Gobeille
Alayne.gobeille@ksfcounsel.com
(admitted *pro hac vice*)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff and the Putative Class*

BARRACK, RODOS & BACINE
Stephen R. Basser (121590)
sbasser@barrack.com
Samuel M. Ward (216562)
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: 619/230-0800
Facsimile: (619) 230-1874

*Liaison Counsel for Lead Plaintiff and the Putative Class*