UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARIM KHOJA, et al., *on behalf of himself and all others similarly situated*,<br><br>                         Plaintiffs,<br><br>v.<br><br>OREXIGEN THERAPEUTICS, INC., et al.,<br><br>                    Defendants. | Case No.:  15-cv-00540-JLS-AGS<br><br>**ORDER:**<br><br>**(1) GRANTING UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION;**<br><br>**(2) GRANTING MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES; AND**<br><br>**(3) ENTERING JUDGMENT**<br><br>**[ECF Nos. 149; 150]** |

Presently before the Court are Lead Plaintiff Karim Khoja's Unopposed Motions for: (1) Final Approval of Settlement and Plan of Allocation ("Final Approval Motion") (ECF No. 149); and (2) an Award of Attorneys' Fees and Litigation Expenses ("Fees Motion") (ECF No. 150).  The Court held a Final Approval Hearing regarding both motions on October 28, 2021.  (ECF No. 154.)  As set forth during the Hearing, because the Settlement and Plan of Allocation are fair, reasonable, and adequate, the Court **GRANTS**

the Final Approval Motion.  Further, because the requested attorneys' fees, litigation expenses, and incentive award, are reasonable the Court **GRANTS** the unopposed Fees Motion.

## BACKGROUND

This case began over six years ago on March 10, 2015, when the first of three initial complaints in this action was filed alleging that Defendant Orexigen Therapeutics, Inc. ("Orexigen") "made materially misleading statements when it disclosed confidential 25[ percent] interim data from a large-scale clinical trial . . . of its weight loss drug, Contrave," on March 3, 2015.  (ECF No. 149-2 ("Abadou Decl.") ¶ 2.)  The news that Contrave may demonstrate cardioprotective benefits caused Orexigen's stock to close "31[ percent] higher than it did the day prior." (*Id.*)  A March 5, 2015 *Forbes.com* article, however, reported that "a senior FDA official condemned [Orexigen]'s disclosure, . . . causing the stock price to plummet and erasing more than $280 million in market capitalization." (*Id.*)

Several related cases were filed premised on the same facts (*id.* ¶ 11), and on June 22, 2015, the Honorable M. James Lorenz ordered the cases consolidated, appointed Karim Khoja ("Lead Plaintiff" or "Plaintiff") as lead plaintiff, and approved Kahn Swick & Foti, LLP ("Lead Counsel") as lead counsel (ECF No. 43).  (Abadou Decl. ¶ 12.)  On June 26, 2015, Judge Lorenz recused himself from the case, and this Court was reassigned.  (ECF No. 46.)

On August 20, 2015, Plaintiff filed a Consolidated Complaint (ECF No. 55), which added allegations of further misleading statements made by Orexigen on March 3 and May 8, 2015.  (Abadou Decl. ¶¶ 12–13.)  Defendants Orexigen, Joseph P. Hagan, Michael A. Narachi, and Preston Klassen (collectively, "Defendants") filed a Motion to Dismiss the Consolidated Complaint (ECF No. 62), which the Court granted with leave to amend (ECF No. 76). (Abadou Decl. ¶ 14.)  Thereafter, Plaintiff requested that the Court enter judgment in Defendants' favor so he could pursue an appeal (ECF No. 77) and subsequently appealed the Court's dismissal decision (ECF No. 80).  (Abadou Decl. ¶ 14.)  On March 12, 2018,

while the appeal was pending, Orexigen filed for Chapter 11 bankruptcy, and an automatic stay halted further proceedings against Orexigen, but not the remaining defendants (collectively, the "Individual Defendants").  (*Id.* ¶¶ 16, 36; *see also id.* ¶¶ 46–52.)

On August 13, 2018, the Ninth Circuit affirmed in part and reversed in part the Court's dismissal of the Consolidated Complaint (ECF No. 93).  (Abadou Decl. ¶¶ 15, 37.) The Individual Defendants filed petitions for panel rehearing and rehearing en banc (ECF No. 85), but the Ninth Circuit denied the petitions (ECF No. 86).  (Abadou Decl. ¶¶ 38–41.)  The Individual Defendants then filed a petition for writ of certiorari with the Supreme Court, but the Court denied certiorari (ECF No. 108).  (Abadou Decl. ¶¶ 43–45.)

Following an Appeal Mandate Hearing on January 7, 2019, (ECF No. 92), this Court issued a briefing schedule for the Individual Defendants to file a renewed motion to dismiss (ECF No. 97).  (Abadou Decl. ¶ 53.)  On September 23, 2019, the Court granted in part and denied in part the Individual Defendants' Renewed Motion to Dismiss (ECF Nos. 98; 110).  (Abadou Decl. ¶ 55.)  On October 17, 2019, Plaintiff filed a Consolidated Amended Complaint ("CAC") (ECF No. 111), which the Individual Defendants moved to dismiss (ECF No. 114).  (Abadou Decl. ¶¶ 56–57.)

On March 13, 2020, the parties participated in a day-long mediation facilitated by Jed Melnick, Esq., of JAMS.  (*Id.* ¶¶ 63–64.)  After reaching an impasse, the parties adjourned but agreed that they would resume settlement discussions after the Court ruled on the Individual Defendants' pending Partial Motion to Dismiss.  (*Id.* ¶ 64.)

On May 19, 2020, after Orexigen's Wind Down Administrator, Province, Inc. ("Province"), filed a status report with the Ninth Circuit reporting that the bankruptcy stay had been lifted, the Ninth Circuit extended its prior order to Orexigen, and the mandate, which noted the substitution of Province for Orexigen, was spread to this Court on July 10, 2020 (ECF No. 134).  (*See* Abadou Decl. ¶ 59.)

On November 2, 2020, the Court granted the Individual Defendants' Partial Motion to Dismiss (ECF No. 139).  (Abadou Decl. ¶ 62.)  Thereafter, the parties resumed settlement negotiations, and, after several weeks of additional negotiations, agreed to

15-cv-00540-JLS-AGS

accept a mediator's proposal of $4.8 million.  (*Id.* ¶¶ 64–65.)  On December 9, 2020, the parties completed and executed a Settlement Term Sheet and filed a Notice of Settlement (ECF No. 140) requesting that the Court set a date for Plaintiff to move for preliminary approval of the parties' settlement.  (Abadou Decl. ¶ 66.)  The Court subsequently ordered Plaintiff to file a motion for preliminary approval of the settlement by February 12, 2021 (ECF No. 141).  (Abadou Decl. ¶ 66.)  Plaintiff filed an Unopposed Motion for Preliminary Approval of Proposed Settlement on February 12, 2021, (ECF No. 142), and the Court granted preliminary approval on April 22, 2021 (ECF No. 147).  (Abadou Decl. ¶ 68.)  On May 18, 2021, the $4.8 million Settlement Amount was paid into an interest-bearing escrow account on behalf of the Settlement Class.  (*Id.* ¶ 69.)  Plaintiff's Final Approval and Fees Motions now follow.

## SETTLEMENT TERMS

The Proposed Settlement[1] preliminarily approved by this Court defines the Settlement Class as:

> "all Persons who purchased or otherwise acquired Orexigen publicly traded securities between March 3, 2015 and May 12, 2015, inclusive," excluding "Defendants, all directors and officers of Orexigen (whether current or former), each of their respective immediate family members, and entities in which any such excluded person holds a controlling interest."

(ECF No. 147 ("Prelim. App. Order") at 4 (quoting ECF No. 142-3 ¶ 1.26).)[2]  The Settlement provides for a $4.8 million Settlement Amount less the following deductions: the reasonable costs and expenses of the Claims Administrator incurred in connection with

---

[1]   Capitalized terms used herein have the same meaning as set forth in the Court's Preliminary Approval Order (ECF No. 147) and the Stipulation of Settlement (ECF No. 142-3) unless otherwise defined.

[2]   Citations to page numbers of documents on the docket are to the page numbers assigned by the CM/ECF system.

providing notice and administrating the settlement (not to exceed $250,000); certain taxes and tax expenses; Lead Counsel's fees (not to exceed 33 percent of the Settlement Amount); and Lead Counsel's and Lead Plaintiff's expenses (not to exceed $185,000). (*Id.* (citing ECF Nos. 142-3 ¶ 6.2; 142-5 at 1).) The remaining balance, i.e., the Net Settlement Fund, is to be distributed to Authorized Claimants. (*Id.*)

Each Settlement Class Member who wishes to receive a portion of the Net Settlement Fund must submit a Proof of Claim and Release Form by the date provided in the Proposed Notice, and any Settlement Class Member who fails to submit a timely Proof of Claim and Release Form will be barred from receiving payment but otherwise bound by the terms of the Settlement. (*Id.* (citing ECF No. 142-3 ¶ 6.3(b)).) Before the deduction of fees, costs, and expenses, Plaintiff's damages expert estimates the average recovery per share to be $0.19, if valid claims are submitted for all approximately 25 million shares of Orexigen securities purchased during the Class Period. (*Id.* at 5 (citing ECF No. 142-5 ¶ 3).)

Each Authorized Claimant will receive a pro rata share of the Net Settlement Fund based on a recognized loss formula, which varies for common stock, call options, and put options. (*Id.* (citing ECF No. 142-5 ¶¶ 49–71).) In exchange, the Class Members:

> shall have fully, finally, and forever waived, released, relinquished, discharged, and dismissed with prejudice all Released Claims against all Released Defendant Parties, and shall forever be barred and enjoined from commencing, instituting, intervening in or participating in, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, or other forum of any kind of character (whether brought directly, in a representative capacity, derivatively, or in any other capacity), that asserts any of the Released Claims against any of the Released Defendant Parties, regardless of whether such Settlement Class Member executed and delivers a Proof of Claim and Release Form, and whether or not such Settlement Class Member shares in the Settlement Fund.

(*Id.* (quoting ECF No. 142-3 ¶ 5.1).)

15-cv-00540-JLS-AGS

**MOTION FOR FINAL APPROVAL**

## I.   Class Certification

A threshold requirement for final approval of a class action settlement is the assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of one of the types of class actions enumerated in subsection (b).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  Here, in the Preliminary Approval Order, the Court found the proposed Settlement Class proper and certified it for settlement purposes.  (Prelim. App. Order at 5–11.)  Because "[t]here have been no changes with respect to factors this Court considered in preliminarily certifying the Settlement Class" (Final App. Mot. at 30), the Court incorporates by reference the reasons set forth in its Preliminary Approval Order and reaffirms that the requirements of Rule 23(a) and (b) have been satisfied.

## II.   Adequacy of Notice

Before granting final approval, a court must also determine whether the class received adequate notice of the settlement.  *Hanlon*, 150 F.3d at 1025.  Here, in the Preliminary Approval Order, the Court approved the content of the forty-eight-page Proposed Notice, the Proof of Claim and Release Form, and the proposed notification plan and authorized Rust Consulting, Inc. ("Rust") to act as the Claims Administrator in connection with the Settlement.  (Prelim. App. Order at 15–17.)  In support of the Final Approval Motion, Plaintiff attached the Declaration of Jason Rabe, a program manager for Rust.  (ECF No. 149-7 ("Rust Decl.") ¶ 1.)  Pursuant to the Preliminary Approval Order and Proposed Settlement, Rust mailed a Notice Packet (consisting of the Notice and Proof of Claim and Release Form) on or around May 12, 2021, to 4,016 mailing records of common banks, brokers, and other nominees.  (Rust Decl. ¶ 2; Abadou Decl. ¶ 71.)  The Notice requested that, within ten days of receipt, these brokers and nominees identify potential Class Members by their names and addresses, forward a copy of the Notice Packet to these potential Class Members, and provided Lead Counsel with written confirmation

of doing so.  (Rust Decl. ¶ 4.)  As of September 23, 2021, the date of the Rust Declaration's execution:

- Rust had received an additional 6,902 names and addresses of potential Class Members from individuals at brokerage firms, banks, institutions, and other nominees.
- Rust received requests from brokers and other nominee holders for 4,920 additional Notice Packets.
- 1,520 Notice Packets were returned to Rust by the United States Postal Service as undeliverable, but 182 new addresses were obtained.
- A total of 16,074 Notice Packets were mailed to potential Class Members.

(*Id.* ¶¶ 5–8.)

Rust also engaged in a number of additional efforts to notify potential Class Members of the Settlement.  On May 12, 2021, Rust established a case-specific, toll-free number with an Interactive Voice Response System and live operators to respond to inquiries about the Settlement.  (*Id.* ¶ 10.)  From May 12, 2021, to September 23, 2021, Rust received forty-seven calls to the telephone hotline.  (*Id.* ¶ 11.)  Also on May 12, 2021, Rust established a case-specific website with general information about the instant matter and downloadable copies of the Notice, Proof of Claim and Release Form, Summary Notice, and other settlement documents.  (*Id.* ¶ 12.)  Additionally, on May 24, 2021, in accordance with the Preliminary Approval Order, Rust released the Summary Notice to be published in the national edition of *Investor's Business Daily*.  (*Id.* ¶ 9.)  As of October 19, 2021, Rust had received 3,123 Proof of Claims and Release Forms.  (ECF No. 153-2 ("Supp. Rust Decl." ¶ 2.)

Having reviewed the Rust Declaration, which provides that notice was disseminated to potential Class Members in the manner ordered by the Court in its Preliminary Approval Order, and the Supplemental Rust Declaration attached to Plaintiff's reply, the Court finds that the Settlement Class received adequate notice of the Settlement.

## III.   Fairness of the Settlement

Before granting final approval, a court must also examine whether the settlement is fair, adequate, and reasonable.  Fed. R. Civ. P. 23(e).  The Ninth Circuit has enumerated

various factors that district courts should consider and balance in determining whether a proposed settlement meets the fair, reasonable, and adequate standard, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.  This fairness determination is committed to the sound discretion of the district court.  *Id.*  Additionally, "[w]here a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010).

### A.     Negotiation at Arm's Length with the Assistance of an Experienced, Neutral Mediator

As detailed by Plaintiff in his Final Approval Motion, the Settlement here was reached with the assistance of an experienced, neutral mediator after "six years of hard-fought litigation, extensive mediation[,] and several months of settlement negotiations." (Final App. Mot. at 15–16.)  Indeed, the Court has already found, and again finds, that the Settlement "was the product of serious, informed, and non-collusive negotiations" (ECF No. 147 at 12) with experienced and well-respected counsel on both sides.  *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007) ("Both [p]arties are represented by experienced counsel and their mutual desire to adopt the terms of the proposed settlement, while not conclusive, is entitled to a great deal of weight." (citing *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977))).  Accordingly, the Court begins its fairness examination with a presumption that the Settlement is fair and reasonable.  *See Garner*, 2010 WL 1687832, at *13.

15-cv-00540-JLS-AGS

### B.   Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

The potential strengths and weakness of Plaintiff's case, and the risk, expense, complexity, and likely duration of further litigation all support final approval of the Settlement.  In the Final Approval Motion, Plaintiff acknowledges that this action, brought pursuant to the Private Securities Litigation Reform Act ("PSLRA"), "was inherently risky and difficult from the outset."  (Final App. Mot. at 18 (citing *Scott v. ZST Digit. Nets., Inc.*, Case No. CV 11-3531 GAF (JCx), 2013 WL 12126744, at *3 (C.D. Cal. Aug. 5, 2013) ("[C]ases brought under [PSLRA] . . . involve a 'heightened level of risk' because PSLRA 'makes it more difficult for investors to successfully prosecute securities class actions.'")).) And to recover under § 10(b) of the Securities Exchange Act and Rule 10(b)-5, Plaintiff would have had to prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss calculation.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Ct. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)). Throughout this case, Defendants have "vigorously den[ied] liability," and notably, challenged the scienter element—"one of the more difficult elements of a securities fraud claim"—in their Motion to Dismiss the Consolidated Complaint (ECF No. 98), arguing that they acted in good faith and did not have motive to commit fraud.  (Abadou Decl. ¶¶ 77, 81 (citing *In re Amgen Inc. Sec. Litig.*, Case No. CV 7-2536 PSG (PLAx), 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016) ("[C]ourts have recognized that a defendant's state of mind in a securities case is the most difficult element of proof and one that is rarely supported by direct evidence."))).  Although Lead Counsel maintains that Plaintiff could have confidently refuted Defendants' scienter arguments at trial, Lead Counsel also recognizes that a jury—with the power to make credibility determinations—could have sided with Defendants.  (*Id.* ¶ 83.)  Lead Counsel further recognizes that Plaintiff faced ///

considerable challenges in proving loss causation and that Defendants' allegedly misleading statements inflated the price of Orexigen securities. (*Id.* ¶ 84.)

Additionally, were litigation to proceed, the parties may have engaged in another round of dismissal arguments before beginning formal discovery, and given the complex factual and legal issues in the case, Plaintiff opines that expert discovery would have been extensive. (*See* Final App. Mot. at 20.) Had the parties not settled, they would have spent considerable time and effort in discovery and litigating class certification and summary judgment, adding "further expense to both sides as well as years of delay of any potential recovery for the putative class." (*Id.* at 20–21.)

The Final Approval Motion reassures the Court that Plaintiff—who spent "more than six years [in] litigation, including undertaking a lengthy appellate process" before the Ninth Circuit and Supreme Court—is fully aware of the strengths and weaknesses of this case. (*Id.* at 21.) All in all, the outcome of this case was uncertain, and the Court agrees that "[s]uch risks, when balanced against the immediate benefits of this Settlement, favor a finding that the Settlement is reasonable." (Abadou Decl. ¶ 83.) Accordingly, the Court finds that these factors weigh in favor of approving the Settlement. *See In re LinkedIn User Priv. Litig*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to a lengthy and expensive litigation with uncertain results.").

## C.  *Risk of Maintaining Class Action Status Throughout Trial*

Plaintiff's risk of maintaining class action status throughout trial supports final approval of the Settlement. In the Final Approval Motion, Plaintiff submits that the class was not yet certified when the parties reached a settlement, and Defendants "undoubtedly would have vigorously contested" certification of the putative class. (Final App. Mot. at 21.) Plaintiff also brings to light the additional complication of a potentially bifurcated Class Period. (*Id.* at 22.) Indeed, in its Order granting in part Defendants' Partial Motion to Dismiss the CAC, the Court found that Plaintiff had not pled sufficient facts to support a continuous class period and "effectively bifurcated the Class Period into two short

10

windows"—March 3–5, 2015, and May 8–12, 2015—"substantially limit[ing] recoverable damages." (*Id.* at 20.)   Further, because Plaintiff purchased common stock in March of 2015 only, Defendants would likely have challenged Plaintiff's standing to bring claims on behalf of those investors who purchased stock in May 2015, and, given that the events complained of occurred in 2015, finding an individual willing to serve as a named plaintiff would have been a "daunting exercise" for Lead Counsel.  (*Id.* at 22.)   The Settlement, however, obviates the risk that potential unrepresented Class Members "might well have lost their chance to recover."  *Browne v. Am. Honda Motor Co.*, No. CV 09–06750 MMM (DTBx), 2010 WL 9499072, at *11 (C.D. Cal. July 29, 2010).   Accordingly, the Court finds that this factor weighs in favor of approving the Settlement.

### D.   *Amount Offered in Settlement*

The $4.8 million Settlement Amount supports final approval of the Settlement.  As provided in the Notice sent to potential Settlement Class Members, Plaintiff's damages expert estimates that, for the 25 million shares purchased during the Class Period, the average recovery per share for Orexigen common stock will be approximately $0.19 per share before deduction of attorneys' fees, costs and expenses, and costs of providing notice and administering the Settlement.  (Rust Decl. at 17.)   Although each Authorized Claimant's recovery will vary depending on, *inter alia*, when the Authorized Claimant purchased or acquired Orexigen securities and when they were sold (Abadou Decl. ¶ 95), the $4.8 million Settlement Amount represents approximately 25 percent of Plaintiff's expert's estimated total potential damages (*id.* ¶ 77; Final App. Mot. at 8, 17).  This recovery is substantial considering that "the median settlement recovery for all securities cases in 2020 represented just 1.7[ percent] of investor losses."  (Final App. Mot. at 17 (citing Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA Econ. Consulting (2021)).   Moreover, the Settlement yields immediate and certain recovery for the Class Members and is not unreasonable in light of the risks, expenses, and likely duration of further litigation in a

///

11

case that has already been pending for more than six years.  Accordingly, the Could finds that the $4.8 million Settlement Amount weighs in favor of approving the Settlement.

### E.    The Extent of Discovery Completed and Stage of the Proceedings

The stage of the proceedings in this case supports final approval of the Settlement. As stated, the parties had been litigating this case for six years and had endured a lengthy appellate process by the time the case settled.  Lead Counsel, having extensively researched and investigated the case and engaged in multiple rounds of dismissal proceedings, "sufficiently knew and understood the merits of [Plaintiff's] claims" before a settlement was reached.  (Final App. Mot. at 23–24.)  Additionally, although the parties never began formal discovery, they exchanged informal discovery, including documents in advance of mediation, and Plaintiff engaged with experts to assess loss causation and damages.  (*Id.*) *See also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[I]n the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." (quoting *Linney v. Cellular Alaska P'Ship*, 151 F.3d 1234, 1239 (9th Cir. 1998))).  The insight gained by Lead Counsel after six years of "extensive investigation, substantial motion practice, hard-fought settlement negotiations[,] and informal discovery" leaves little doubt that further discovery would aid in Lead Counsel's knowledge of the case and the strengths and weaknesses of Plaintiff's claims.  Accordingly, the Court finds that this factor weighs in favor of approving the Settlement.

### F.    Experience and Views of Counsel

Lead Counsel's experience and belief that the Settlement is fair, reasonable, and in the best interests of the Settlement Class supports final approval of the Settlement.  Per the firm resume attached to the Final Approval Motion, and as recognized by the Court in its Preliminary Approval Order, Lead Counsel has extensive experience prosecuting complex securities class actions.  (*See* Prelim. App. Order at 147 at 9; ECF No. 149-4.)  Given Lead Counsel's experience with the case and expertise with securities class actions, the Court presumes reasonable Lead Counsel's recommendation to approve the Settlement.  *See*

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness. Attorneys, having an intimate familiarity with a lawsuit after spending years in litigation, are in the best position to evaluation the action . . . .").

Additionally, although the Settlement was reached prior to class certification, no circumstances of collusion appear here. The Settlement Class will receive an immediate monetary benefit, the Stipulation of Settlement does not contain a "clear sailing" provision, and any unclaimed fees will not revert back to Defendants but will be donated to an appropriate and Court-approved 501(c)(3) non-profit organization. (*See* Final App. Mot. at 25–26.) And, as addressed *supra*, the Settlement was negotiated and reached at arm's length with the assistance of an experienced, neutral mediator and both Lead Counsel and defense counsel are capable and experienced. Accordingly, the Court finds that Lead Counsel's experience and opinion that the Settlement is fair, weighs in favor of approving the Settlement.

### G.    *Reaction of the Class Members to the Settlement*

The reaction of the Class Members to the Settlement supports final approval of the Settlement. As detailed above, the Claims Administrator, Rust, mailed 16,074 Notice Packets to potential Settlement Class Members and nominees and had not received any requests for exclusion from the Settlement Class as of October 19, 2021. (Supp. Rust Decl. ¶¶ 4–5.) Also as of October 21, 2021, Plaintiff had not received any objections to or requests for exclusion from the Settlement, and the deadline to either object or to request exclusion passed on October 7, 2021. (ECF No. 153-1 ("Supp. Abadou Decl.") ¶ 7.) At the Final Approval Hearing on October 28, 2021, Lead Counsel again confirmed that no objections to or requests for exclusion from the Settlement had been received. Considering the number of Notice Packets mailed to potential Class Members and the fact that zero objections have been filed, the Court finds that the reaction of the Class Members to the Settlement weighs in favor of approving the Settlement. *See Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("[T]he absence of a large number

of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

### H.   Conclusion

Because all of the pertinent *Harlon* factors support final approval of the Settlement, the Could finds that the Settlement is fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e).

## IV.   Plan of Allocation

In addition to the terms of the Settlement itself, the Court must determine whether the Plan of Allocation ("Plan") is fair, reasonable, and adequate. "Approval of a plan of allocation of settlement proceeds in a class action under [Rule] 23 is governed by the same standards of review applicable to approval of settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 16, 1994) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir. 1992)). "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *Id.*

Here, Plaintiff prepared the Plan "after careful consideration and analysis" and with the assistance of damages expert Dr. Zachary Nye. (Final Approval Mot. at 30.) The Plan provides for a recognized loss formula to apportion the Net Settlement Fund to Authorized Claimants based on when they acquired and/or sold Orexigen securities during the Class Period and is designed to "equitably distribute the Net Settlement Fund among Authorized Claimants based on their respective alleged economic losses as a result of [Defendants'] alleged misstatements and omissions, as opposed to losses caused by the market- or industry-wide factors, or company-specific factors unrelated to the alleged fraud." (ECF No. 149-7 at 24.) Further, the formula "ensures that Settlement Class Members' recoveries are based upon the relative losses they sustained" and that "[a]ll Settlement Class Members will receive a pro rata distribution from the Net Settlement Fund calculated in the same matter." (Abadou Decl. ¶ 94.) The Plan "is not a formulized damage study but, rather, a simplified methodology designed to compare one Settlement Class Member to another

through their respective Class Period transactions in Orexigen securities." (Final App. Mot. at 31.)

Having reviewed the Plan (ECF No. 149-7 ¶¶ 48–71), the Court finds that it is fair, reasonable, and adequate, for it is based on a damages theory that Plaintiff developed in consultation with a damages expert and aims to equitably distribute the Net Settlement Funds based on each Authorized Claimant's losses. *See Schueneman v. Arena Pharms., Inc.*, Case No.: 3:10-CV-01959-CAB-(BLM), 2020 WL 3129566, at \*7 (S.D. Cal. June 12, 2020) (finding a plan of allocation, which was recommended by lead counsel "after careful consideration and analysis" and prepared "with the assistance of a damages expert," fair and adequate). Further lending support to this conclusion is the fact that zero Class Members have requested exclusion from or filed objections to the Settlement.

## V.     Conclusion

Because the Settlement and the Plan of Allocation are both fair, reasonable, and adequate, the Court **GRANTS** the Final Approval Motion (ECF No. 149).

### MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

Lead Plaintiff also moves for an order approving: (1) an award of $1,584,000 in attorneys' fees for Lead Counsel (33 percent of the $4.8 million Settlement Amount); (2) an award of $100,529.65 in litigation expenses for Lead Counsel; and (3) a $9,230 incentive award to Lead Plaintiff. (Fees Mot. at 9.) Additionally, at the Final Approval Hearing, Plaintiff orally requested that the Court approve reimbursement to Lead Counsel of the reasonable costs and expenses incurred by Rust in connection with providing notice and administrating the settlement in an amount not to exceed $250,000. The Court addresses each request in turn.

## I.     Attorneys' Fees

### A.     *Legal Standard*

Federal Rule of Civil Procedure 23(h) permits a court to award reasonable attorneys' fees "authorized by law or by the parties' agreement." In the Ninth Circuit, a district court has discretion to apply either a lodestar method or a percentage-of-the-fund method in

calculating a fee award in a common fund case.  *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002).   In this case, the Court finds that the percentage-of-the-fund calculation is preferable to the lodestar approach.  *See Aichele v. City of Los Angeles*, Case No.: CV 12–10863–DMG (FFMx), 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015) ("Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner."); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee . . . .").

When applying the percentage-of-the-fund approach, the Ninth Circuit has routinely treated 25 percent as the "benchmark" a district court should award.  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)); *see also Fischel*, 307 F.3d at 1006 ("We have established a 25 percent 'benchmark' in percentage-of-the-fund cases . . . .").  The district court, however, "may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 379 (citing *Six (6) Mexican Workers*, 904 F.2d at 1311).  "Selection of the benchmark or any other rate," whether higher or lower than 25 percent, "must be supported by findings that take into account all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048. Relevant factors when determining the percentage ultimately awarded may include: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.  *See id.* at 1048–50.  When using the percentage-of-the-fund approach, district courts may also apply the lodestar method as a cross-check of the reasonableness of the percentage award.  *See id.* at 1050 ("[Although] the primary basis of

the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award."); *see also Aichele*, 2015 WL 5286028, at \*2 (analyzing "comparison with counsel's lodestar" as one of eight factors it considered in determining the reasonableness of the requested percentage award).

### B.    Analysis

Considering the circumstances of this case, Lead Counsel's departure from the 25 percent benchmark and request for 33 percent of the $4.8 million Settlement Amount in attorneys' fees, or $1,584,000, is reasonable.  As highlighted by Lead Counsel in the Fees Motion, several factors support Lead Counsel's request for 33 percent of the Settlement Amount.  For one, Lead Counsel achieved significant results for the Settlement Class, as the $4.8 million obtained represents approximately 25 percent of the estimated potential damages in this action.  (Fees Mot. at 13–14.)  And having taken this case purely on a contingency basis, Lead Counsel risked incurring significant costs and devoted a substantial amount of time to this matter with no guarantee of compensation.  (*See id.* at 14–15.)  Counsel collectively "spent over four thousand hours researching, investigating, and prosecuting this case on behalf of the putative class" and fronted "$100,529.65 in costs and expenses," again, with no guarantee of recovery.  (*Id.* at 24.)  Moreover, as discussed *supra*, the risks of continuing this securities class action were not insignificant.  (*See id.* at 14–17.)

Departure from the 25 percent benchmark is further warranted when considering the significant skill and extensive work demanded of Lead Counsel in this case.  Lead Counsel, among other things, expanded the originally alleged two-day Class Period after being appointed Lead Counsel and thoroughly investigating the case (*see id.* at 17–19); successfully appealed to the Ninth Circuit (*see id.* at 19–20); successfully challenged Defendants' request for en banc review (*see id.* at 20); successfully challenged Defendants' petition for writ of certiorari to the Supreme Court (*see id.* at 20–21); retained bankruptcy counsel to protect the interests in the putative class after Orexigen filed for bankruptcy (*id.* at 22–23); and engaged in informal discovery in advance of mediation and prepared

"aggressive" mediation briefs (*id.* at 23–24). As detailed extensively in the Fees Motion and described above, Lead Counsel overcame several hurdles before the parties settled the case, and settlement may not have been reached without Lead Counsel's skill and expertise.

Additionally, as several courts in the Ninth Circuit—including this Court—have observed, attorneys' fee awards from settlements involving a common fund, as this Settlement involves, frequently exceed the 25 percent benchmark. *Ford v. ECE Ent. Inc.*, Case No.: 14cv677 JLS (JLB), 2015 WL 11439033, at *5 (S.D. Cal. Dec. 14, 2015) (citing *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008); *Pokorny v. Quixtar, Inc.*, CASE NO. C 07–0201 SC, 2013 WL 3790896, at *4 (N.D. Cal. July 18, 2013)); *e.g.*, *Jamil v. Workforce Res.*, Case No.: 18-CV-27 JLS (NLS), 2020 WL 6544660, at *4 (S.D. Cal. Nov. 5, 2020) (approving an attorneys' fees award of one-third of the common fund); *Howell v. Advantage RN, LLC*, Case No.: 17-CV-883 JLS (BLM), 2020 WL 5847565, at *5 (S.D. Cal. Oct. 1, 2020) (approving an attorneys' fees award of one-third of the common fund); *Ruiz v. XPO Last Mile, Inc.*, Case No.: 5-CV-2125 JLS (KSC), 2017 WL 6513962, at *8 (S.D. Cal. Dec. 20, 2017) (approving an attorneys' fees award of 35 percent of the common fund). Indeed, "[d]istrict courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case," and the Ninth Circuit has upheld such awards. *See Beaver v. Tarsadia Hotels*, Case No. 11-cv-01842-GPC-KSC, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017) (collecting cases).

And again, no Class Member has objected to or requested exclusion from the Settlement. As this Court has recognized in other cases, the reasonableness of Lead Counsel's fee request is bolstered by the reaction of the Settlement Class and the fact that not a single Class Member has objected. *See Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1056 (S.D. Cal. 2017) (citing *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG (BLM), 2010 WL 2196104, at *9 (S.D. Cal. June 1, 2010) (noting that the 33.33 percent fee request was "especially" warranted "in light of the fact that not a single class member objected to" the request)).

Finally, the lodestar cross-check here yields a fractional multiplier, which further supports Lead Counsel's 33 percent fee request.  *See, e.g.*, *In re Regulus Therapeutics Sec. Litig.*, Case No.: 3:17-cv-182-BTM-RBB, Case No.: 3:17-cv-267-BTM-RBB, 2020 WL 6381898, at *8 (S.D. Cal. Oct. 30, 2020) ("[A] multiplier less than 1.0 is below the range typically awarded by courts [in common fund cases] and is presumptively reasonable.").  Collectively, Counsel expended 4,185.35 hours of work in this case, which amounts to $2,995,448.75 in fees.  (Abadou Decl. ¶¶ 118–30.)  This lodestar amount compared against the $1,584,000 requested in fees results in a fractional multiplier of 0.528.  (*Id.* ¶ 119.)  The lodestar cross-check therefore provides a strong indication of the reasonableness of Lead Counsel's requested percentage award.

Having reviewed the Fees Motion and its supporting exhibits, Lead Counsel's arguments, and the applicable law, Lead Counsel's request for 33 percent of the $4.8 million Settlement Amount is reasonable under the circumstances, particularly considering the substantial results achieved, the risk to Lead Counsel in taking a complex securities class action on contingency, the extensive amount of work demanded of Lead Counsel, and the lodestar cross-check.  Accordingly, the Court approves Lead Counsel's request for 33 percent of the $4.8 million Settlement Amount, or $1,584,000, in attorneys' fees.

## II.    Litigation Expenses

Although the Settlement Agreement authorizes Lead Counsel to apply for reimbursement of up to $185,000 in litigation expenses, Lead Counsel seeks reimbursement of only $100,529.65 in expenses, plus interest at the same rate earned by the Settlement Fund.  (Fees Mot. at 28.)  Lead Counsel's expenses are documented in the declarations attached to the Final Approval Motion (*see* Abadou Decl. ¶¶ 131–41; ECF Nos. 149-8; 149-9), and the types of expenses that Lead Counsel seeks reimbursement for include expert and consultant fees (Abadou Decl. ¶ 138); legal research costs (*id.* ¶ 139); travel (*id.* ¶ 140); and miscellaneous costs related to printing and photocopying, postage, transcript fees, mediation fees, court reporter fees, and court/filing fees (*id.* ¶ 141).  As these types of expenses are typically incurred by counsel in complex litigation and are

routinely charged to clients billed by the hour, they are recoverable. *In re Omnivision Techs.*, 559 F. Supp. 2d at 1049 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."). Moreover, no Class Member has objected to Lead Counsel's request for reimbursement of expenses up to $185,000.

Accordingly, because Lead Counsel's expenses are typical and reasonable, the Court approves Lead Counsel's request for reimbursement of $100,529.65 in litigation expenses.

## III.    Incentive Award

Plaintiff also seeks an incentive award of $9,230 "to compensate him for his service to the Settlement Class . . . and to reimburse him for the reasonable costs incurred directly from his work representing the Settlement Class." (Abadou Decl. ¶ 146; *see* Fees Mot. at 29.) Although the PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," it does not preclude an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Incentive awards, like the one Plaintiff requests, are "fairly typical" and are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).

To the Final Approval Motion, Plaintiff attached his own declaration detailing the role he played in this case over the six years it has been pending. (ECF No. 149-10.) Among other things, Plaintiff declares that he: (1) participated in meetings and correspondence with Lead Counsel (*id.* ¶ 6); (2) reviewed correspondence, memoranda, and court filings (*id.*); (3) reviewed draft pleadings and briefs, including those made in the appellate and bankruptcy proceedings (*id.* ¶ 5); and (4) prepared for and participated in settlement negotiations, mediation, and discussions concerning the terms of the Settlement

(*id.* ¶¶ 5, 7).  Plaintiff further declares that he has devoted approximately 48 hours to this case and calculates his average hourly rate, based on his own annual compensation, to be $192.30.  (*Id.* ¶ 9.)

Based on the representations made by Plaintiff in his declaration and the time he spent assisting the case and fulfilling his obligations as a representative of the putative class, the Court finds that Plaintiff's requested incentive award is reasonable.  Further, Plaintiff's requested award appears in line with others awarded in this District.  *See, e.g.*, *In re Illumina, Inc. Sec. Litig.*, Case No.: 3:16-cv-3044-L-MSB, 2021 WL 1017295, at *8 (S.D. Cal. Mar. 17, 2021) (awarding class representative $25,000 for 70 hours of work, or approximately $357 per hour); *Mauss v. NuVasive, Inc.*, Case No.: 13cv2005 JM (JLB), 2018 WL 6421623, at *10 (S.D. Cal. Dec. 6, 2018) (awarding class representative $7,500 based on 38 hours of work in the case at an estimated rate of $200 per hour); *see also In re Regulus Therapeutics Inc. Sec. Litig.*, 2020 WL 6381898, at *8 ("Incentive awards typically range from $2,000 to $10,000." (quoting *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015))).  Additionally, the Stipulation of Settlement authorizes Plaintiff to receive reimbursement directly related to his representation of the Settlement Class, and no Class Member has objected to this request.  Accordingly, the Court approves Plaintiff's requested incentive award of $9,230.

## IV.    Reimbursement of Claims Administration Costs

Lastly, Lead Counsel seeks approval of its request for reimbursement of the reasonable costs and expenses incurred by Rust in connection with providing notice and administering the Settlement.  Lead Counsel did not specifically include this request in the Fees Motion and instead made the request orally at the Final Approval Hearing.  At the Hearing, Lead Counsel represented that, because the claims administration is ongoing, it did not yet have a final figure for the total claims administration costs.

As stated above, the Stipulation of Settlement authorizes a deduction of up to $250,000 from the $4.8 million Settlement Amount for the reasonable costs and expenses incurred by Rust in providing notice and administering the Settlement.  Because the Court

approves the Settlement, and no Class Member has objected to the deduction of claims administration costs from the Settlement Fund, the Court approves Lead Counsel's request for reimbursement of claims administration expenses up to $250,000, with any excess to remain in the common fund.

**V.    Conclusion**

Because the requested attorneys' fees, litigation expenses, and incentive award are reasonable, the Court **GRANTS** the Fees Motion (ECF No. 150) and awards Lead Counsel $1,584,000 in attorneys' fees and $100,529.65 in litigation expenses and awards Lead Plaintiff a $9,230 incentive award.  Additionally, the Court **GRANTS** Lead Counsel's oral request for reimbursement of claims administration expenses up to $250,000.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Lead Plaintiff's Final Approval Motion (ECF No. 149) and Fees Motion (ECF No. 150).

The Court **CERTIFIES** the Settlement Class for purposes of the Settlement and **APPROVES** the Settlement and the Plan of Allocation as fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e).  The Court **ORDERS** the parties to undertake the obligations set forth in the Stipulation of Settlement that arise out of this Order.

The Court **AWARDS** attorneys' fees to Lead Counsel in the amount of **$1,584,000** and litigation expenses in the amount of **$100,529.65**.  The Court also **AUTHORIZES** Lead Counsel to deduct **up to $250,000** from the Settlement Fund for reimbursement of the claims administration expenses after the total claims administration expenses are known.

The Court further **AWARDS** Plaintiff an incentive award in the amount of **$9,230** for the work he performed as the class representative.

///

///

///

The Court **DIRECTS** the Clerk of Court to enter a separate judgment of dismissal in accordance herewith and to close the case.  Without affecting the finality of this Order, the Court maintains jurisdiction with respect to the implementation and enforcement of the terms of the Stipulation of Settlement.

**IT IS SO ORDERED.**

Dated:  November 30, 2021

Hon. Janis L. Sammartino
United States District Judge

15-cv-00540-JLS-AGS